Exhibit 9

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Plaintiff,

v.                              Case No. 3:23-CV-01132-BJD-MCR

WASTE PRO OF FLORIDA, INC.,

     Defendant.

_____

**PLAINTIFF U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S AMENDED RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("FRCP") and the Local Rules of the Middle District of Florida, Plaintiff U.S. Equal Employment Opportunity Commission ("Plaintiff" or "EEOC") hereby objects to Defendant Waste Pro of Florida, Inc.'s ("Defendant" or "Waste Pro") First Set of Interrogatories to Plaintiff, dated November 8, 2023 (the "Interrogatories" or "Defendant's First Set of Interrogatories"). Pursuant to an agreement between the parties, the objections that follow will be supplemented with substantive answers at a later date.

1.     EEOC responds to the Interrogatories based on the best of its present knowledge. EEOC reserves the right to supplement or amend these objections and responses upon, among other things, discovery of additional facts and materials and

subject to other developments or proceedings in this action. EEOC reserves the right
to make any use of, or introduce at any hearing or at trial, information and materials
responsive to the interrogatories discovered subsequent to the date of its Responses.

2.    EEOC has conducted a reasonable inquiry into the requested matters;
however, it cannot answer interrogatories that seek information known only to third
parties who are not named claimants.  To the extent a request seeks information
known to third parties who are not named claimants, EEOC objects, as any answer
would be burdensome, speculative, and equally available to Defendant. *See* FRCP
26(b)(1) (noting the importance of "relative access to relevant information" to the
scope of discovery).

3.    EEOC's Responses to any Interrogatory shall not be deemed to
constitute an admission that any particular disclosure is relevant or is admissible as
evidence.

4.    EEOC objects to the "Definitions" and "Instructions" contained in the
Interrogatories to the extent that they seek to impose burdens on EEOC that are
greater than those imposed by the Federal Rules of Civil Procedure and the Local
Rules. EEOC will respond to the Interrogatories in accordance with its obligations
under the Federal Rules of Civil Procedure and the Local Rules.

January 8, 2024 Supplementary Response: The EEOC clarifies that
although it responded subject to and limited by its objections, pursuant to MDFL
Civil Discovery Handbook § A.3 at 22, EEOC attempted to give Waste Pro's
definition and instructions a reasonable interpretation, and in doing so read them in

2

such a way as to be consistent with the applicable Federal and Local rules. ("When

in doubt about the meaning of an interrogatory, the responding party should give it

a reasonable interpretation . . . .").[1]

5.      EEOC objects to Definition No. 2 because it is vague, ambiguous,

overbroad, and requires speculation. According to Defendant, the terms "you" and

"your" "refer to Plaintiff, U.S. Equal Employment Opportunity Commission, and

its and its attorneys, agents, representatives, and any and all other persons and/or

entities acting on behalf of. [sic]" The definition could encompass thousands of

persons and does not make grammatical sense.

January 8, 2024 Supplemental Response: Nonetheless, EEOC is

responding to these Interrogatories based upon information EEOC learned during

the administrative investigation and based upon information known to

Undersigned Counsel.  EEOC has not withheld any information on the basis of

this objection.

6.      EEOC objects to the terms "date" as it is defined in Definition No. 5

and associated requests because the definition provided states that the date shall

mean only "month and year if ascertainable. . . ." This definition is vague,

ambiguous, and inconsistent with the terms' usage in Request Nos. 3, 4, 7, and 8,

which appear to seek the precise day and/or time. Moreover, Defendant's request

---

[1] At the parties' January 5, 2024 conferral, Waste Pro declined to identify any deficiency in
EEOC's responses that it believes violates its instructions or definitions section and not the
Federal or Local rules. Subject to any such clarification in the future, EEOC believes this
objection may be moot, except as otherwise noted in these responses and objections.

for the "best approximation of the date (based upon the relationship to other events)" is vague, ambiguous, and calls for speculative guess work.

7.    EEOC Objects to Definition No. 1 and associated interrogatories because Definition No. 1 defines the term "Waste Pro" to include persons and entities acting on its behalf and this definition is overbroad, requires speculation, as such information is not known with certainty by the EEOC.

## INTERROGATORIES

**Interrogatory No. 1**:    Identify all aggrieved class members who were deprived of equal employment opportunities because of their race, color and/or national origin as alleged in paragraph 54 of your Complaint.

**Response:** As it is written, this request is objectionably vague and ambiguous because it appears to seek information that is to be determined by the Court in the course of this litigation. *Feise v. N. Broward Hospital Dist.*, No. 14-cv-61556, 2015 WL 2341221, *4 (S.D. Fla. May 12, 2015) (noting that whether or not an employee is ultimately found to be similarly situated so as to qualify as a comparator is to be determined later in the litigation, rather than in discovery). Accordingly, EEOC reasonably interprets the request to seek the identity of "aggrieved class members who EEOC [*has alleged*] were deprived of equal employment opportunities. . . ." *See* MDFL Civil Discovery Handbook § A.3 at 22 ("When in doubt about the meaning of an interrogatory, the responding party should give it a reasonable interpretation . . . ."). Additionally, EEOC objects to this request to the extent it seeks to know the opinion of EEOC attorneys regarding the identity of persons whom the Agency has not yet

4

determined are members of the class, as such a request necessarily encompasses pre-decisional attorney mental impressions that are protected by the government's deliberative process privilege and the work product doctrine. Finally, EEOC objects that the request is premature because EEOC will seek updated employee rosters in discovery (for purposes of identifying aggrieved individuals) and because information needed to determine which Waste Pro employees were subjected to a hostile work environment will likely be derived from third-party witnesses and is equally available to Defendant, if not within its own control. *See Pimentel v. HGA Quest, Inc.*, No. 212CV176FTM29DNF, 2013 WL 12159452, at *6 (M.D. Fla. Apr. 10, 2013) ("The Court recognizes the Plaintiff's need for the information to identify similarly situated employees who may desire to join this action and have no other way to obtain the employees' information."); *Griffith v. Landry's, Inc.*, No. 8:14-CV-3213-T-35JSS, 2015 WL 6468134, at *2 (M.D. Fla. Oct. 9, 2015) ("Defendants must identify the putative class member employees. . . .").

Subject to and limited by the foregoing objections, EEOC answers that it has identified Fednol Pierre and Deandra Pinckney as aggrieved class members. EEOC is unable to identify additional class members subjected to a hostile work environment at this early stage, but will supplement its response on a rolling basis in advance of any deadline set by the Court to identify class members.

**Interrogatory No. 2**:   Identify all members of the class of Black and/or Haitian employees who were subjected "to a hostile work environment based on their race, color, or national origin" as alleged in paragraph 35 of your Complaint.

**Response:** As it is written, this request is objectionably vague and ambiguous because it appears to seek information that is to be determined by the Court in the course of this litigation. *Feise v. N. Broward Hospital Dist.*, No. 14-cv-61556, 2015 WL 2341221, *4 (S.D. Fla. May 12, 2015) (noting that whether or not an employee is ultimately found to be similarly situated so as to qualify as a comparator is to be determined later in the litigation, rather than in discovery). Accordingly, EEOC reasonably interprets the request to seek the identity of "aggrieved class members who EEOC [*has alleged*] were deprived of equal employment opportunities. . . ." *See* MDFL Civil Discovery Handbook § A.3 at 22 ("When in doubt about the meaning of an interrogatory, the responding party should give it a reasonable interpretation . . . ."). f. Finally, EEOC objects that the request is premature because EEOC will seek updated employee rosters in discovery (for purposes of identifying aggrieved individuals) and because information needed to determine which Waste Pro employees were subjected to a hostile work environment will likely be derived from third-party witnesses and is equally available to Defendant, if not within its own control. *See Pimentel v. HGA Quest, Inc.*, No. 212CV176FTM29DNF, 2013 WL 12159452, at *6 (M.D. Fla. Apr. 10, 2013) ("The Court recognizes the Plaintiff's need for the information to identify similarly situated employees who may desire to join this action and have no other way to obtain the employees' information."); *Griffith v. Landry's, Inc.*, No. 8:14-CV-3213-T-35JSS, 2015 WL 6468134, at *2 (M.D. Fla. Oct. 9, 2015) ("Defendants must identify the putative class member employees. . . .").

Subject to and limited by the foregoing objections, EEOC answers that it has identified Fednol Pierre and Deandra Pinckney as aggrieved class members. EEOC is unable to identify additional class members subjected to a hostile work environment at this early stage, but it will supplement its response on a rolling basis in advance of any deadline set by the Court to identify class members.

**Interrogatory No. 3**:  For each of the "comments and slurs regarding [Fednol Pierre's] race and Haitian heritage [that occurred on] nearly a daily basis" as alleged in paragraph 17 of your Complaint, state (a) the date on which each comment or slur occurred, (b) the substance of the comment or slur, (c) the identity of the person who made the comment or slur, (d) the identity of any person(s) who witnessed the comment or slur, and (e) the identity of any person(s) to whom Fednol Pierre complained about the comment or slur.

**Response:** EEOC objects on the grounds this interrogatory is vague and ambiguous and mischaracterizes the allegation contained in paragraph 17, which describes the continuous, ongoing harassment Mr. Pierre endured over the course of his employment in Jacksonville. The repeated racist diatribes endured by Mr. Pierre are not easily partitioned into discrete comments or individual slurs, nor does the law view them as such. In *National Rail Road Passenger Corporation v. Morgan*, the Supreme Court held that *"*[h]ostile work environment claims are different in kind from discrete acts. Because their very nature involves repeated conduct . . . [it] cannot be said to occur on any particular day. It occurs over a series of days or perhaps years . . . in direct contrast to discrete acts . . . ." 536 U.S. 101, 103 (2002).

7

Neither Mr. Pierre, nor the interviews of Waste Pro employees from which the allegation in Paragraph 17 was derived, described the ongoing, frequent harassment Mr. Pierre endured in terms of individually divisible slurs/comments, and instead described a course of conduct involving slurs and comments occurring repeatedly over the course of several months, from November 2021 through May 12, 2022.

Furthermore, EEOC objects as this is an unduly burdensome contention interrogatory, which is both premature at this stage, and better suited for a less burdensome discovery device such as a deposition. *Waters Edge Living, LLC v. RSUI Indem. Co.*, No. 06cv334-RH/WCS, 2008 WL 4539463, at *5 (N.D. Fla. Apr. 22, 2008) ("[w]here a party could use a different discovery tool to obtain the same information while imposing less of a burden, a court would be constrained to rule that a contention interrogatory need not be answered.") (internal quotations omitted); *In re Checking Acct. Overdraft Litig.*, No. 09-MD-02036-JLK, 2010 WL 5136043, at *3 (S.D. Fla. Dec. 16, 2010) ("Compelling parties to respond partially to such interrogatories early in the litigation when they will likely simply be asked to respond again, upon completion of document review or other phases of discovery, lacks finality and compounds the time, effort and cost of the litigation."). Moreover, EEOC objects that Interrogatory No. 3 is overbroad because Mr. Pierre was the subject of numerous conversations regarding his race and it would be impossible and impractical to recall each comment, and the request impermissibly seeks information derived from third parties that is not reasonably accessible to EEOC.

EEOC also objects because the terms in the request are undefined, vague and

8

ambiguous in several respects. The term "substance of the comment or slur" is vague, ambiguous and subject to interpretation. The term "date" is undefined and ambiguous in light of the definition of "date" provided in the definition section of the interrogatories, which seeks only the month and year. Finally, the request is objectionably vague and ambiguous because as it is written, it appears to seek information limited to only those slurs/comments that occurred on a "near daily basis." ("For each of the comments and slurs regarding Fednol Pierre's race and Haitian heritage that occurred on nearly a daily basis . . . .") (internal quotes/punctuation omitted).

Subject to and limited by the foregoing objections, EEOC answers that based on its present knowledge, the only comment/slur that Mr. Pierre was subjected to on a near daily basis was the N-word. Other comments and slurs, such as those regarding monkeys and his Haitian heritage, were interspersed more sporadically. EEOC further responds to subparts (a)-(e) as follows:

(a)    The N-word was used to describe Mr. Pierre soon after his arrival in Jacksonville, in November 2021, and continued to be used in December 2021, January 2022, and February 2022, as well as in March 2022, when he again reported the use of the N-word and other slurs to a different supervisor, Granville Carter. Thereafter, Mr. Pierre moved to the night shift, and although the comments and harassment continued, he heard the N-word less frequently.

(b)    See above, the N-word was the primary slur used on nearly a daily basis.

(c)    Mr. Pierre heard both Mr. Watts and Mr. Shuman use the N-word in the

workplace.

(d)   The N-word was used openly and in the presence of other employees including, at least, Maintenance Manager Brian Outten, Deandra Pinckney, Walky Richmond, and Jean Etienne. Additionally, Zachary Johnson told the EEOC that Mr. Shuman and Mr. Watts would call Mr. Pierre racial slurs and that their conduct was witnessed by Maintenance Manager Granville Carter and Tyler Carter.

(e)   Mr. Pierre reported the slurs to John Lovelady in December 2021, to Granville Carter in March 2022, to Todd Juniper and an unknown manager in March 2022, and to Rita Risner in March 2022, and told Granville Carter his reason for resignation was that nothing had been done as a result of his prior complaints.

In addition, EEOC refers Defendant to its response to Interrogatory No. 10. Please note that additional comments/slurs, such as those referenced in the Complaint, were used to describe the race and heritage of Mr. Pierre. EEOC reserves the right to supplement this response as Defendant and witnesses identify additional comments/slurs that occurred on a near daily basis. *See* EEOC Interrogatory Appendix at 003, Johnson Interview ("Sometimes they made comments every day, or every other day."); EEOC Interrogatory Appendix at 055, Risner Interview (describing racial comments such as the N-word to be ubiquitous enough to be described as "always"); EEOC Interrogatory Appendix at 1, Risner Notes 062 ("I spoke to William Watts first and he did say that they always joked around and often

threw out racial slurs . . . .").

January 8, 2024 Supplementary Response:  EEOC reiterates that information sought in this request is duplicative of information sought in Request No. 10 and it incorporates by reference its response to that interrogatory as well as to Interrogatory No. 8 and 9 as well.

EEOC has not withheld any information regarding the date and timing of events.  EEOC will supplement its Interrogatory Responses to the extent more information becomes available.

Additionally, as described in its objections, EEOC narrowed its answer to this interrogatory based on its reasonable interpretation of the language of the request, but it otherwise fully responded to the interrogatory with all presently known facts. Additionally, at the parties' January 5, 2024 conferral, EEOC offered to further supplement its response to include any additional information Waste Pro sought, so long as it amended the language in its request to reflect the precise information that was requested. EEOC remains willing to further supplement its response to provide additional information so long as the clarifications and modifications are reduced to writing in the request.

**Interrogatory No. 4**:  For any comments and slurs directed to Deandra Pinckney regarding his race or Haitian heritage, state (a) the date on which each comment or slur occurred, (b) the substance of the comment or slur, (c) the identity of the person who made the comment or slur, (d) the identity of any person(s) who witnessed the comment or slur, and (e) the identity of any person(s) to whom Deandra

Pinckney complained about the comment or slur.

EEOC objects to Interrogatory No. 4 because the request is overbroad and unduly burdensome in that it seeks detailed descriptions of the substance of every comment regarding Mr. Pinckney's race, regardless of speaker or whether the comment occurred at Waste Pro, and because it is not limited by relevance, context, temporal scope or otherwise. Courts have consistently refused to compel responses to similar requests seeking information about all conversations on a given topic because they are overbroad and unduly burdensome. *Lane v. Guar. Bank*, No. 6:13-CV-259-ORL-36, 2013 WL 4028185, at *2 (M.D. Fla. Aug. 7, 2013) ("To identify every 'communication' between Plaintiffs and 'any person' would cause undue burden on Plaintiff."); *Bailey v. Equifax Credit Info. Servs., Inc.*, No. 1:14-CV-797-MHC-JCF, 2016 WL 11540575, at *2 (N.D. Ga. July 11, 2016) (holding a party "need not be required to identify, summarize and describe every single communication related in any manner . . . as doing so would be unduly burdensome."). For example, as written, this request could include comments made by Mr. Pinckney's friends, family members, past employers or even his own comments regarding his race.

EEOC also objects to this request because it seeks the content of communications subject to the government's common interest and deliberative process privilege to the extent it seeks to know the contents of communications between EEOC employees and attorneys. Additionally, the request is vague and ambiguous, as the term "directed to" is undefined and encompasses comments

concerning Mr. Pinckney of which he is not aware. Likewise, the request does not define the term "complained," and it is unclear whether it seeks complaints made to persons other than Defendant.

Further, EEOC objects as this is interrogatory is premature at this stage of litigation and better suited for a less burdensome discovery device such as a deposition. *Waters Edge Living, LLC v. RSUI Indem. Co.*, No. 06cv334-RH/WCS, 2008 WL 4539463, at *5 (N.D. Fla. Apr. 22, 2008) ("[w]here a party could use a different discovery tool to obtain the same information while imposing less of a burden, a court would be constrained to rule that a contention interrogatory need not be answered.") (quotations omitted); *In re Checking Acct. Overdraft Litig.,* No. 09-MD-02036-JLK, 2010 WL 5136043, at *3 (S.D. Fla. Dec. 16, 2010) ("Compelling parties to respond partially to such interrogatories early in the litigation when they will likely simply be asked to respond again, upon completion of document review or other phases of discovery, lacks finality and compounds the time, effort and cost of the litigation.").

Finally, EEOC objects to this request on the basis of the work product doctrine, to the extent the request seeks to know mental impressions of counsel, including which facts counsel believes to be known to third-party witnesses that will support its allegations if memorialized into admissible evidence in upcoming depositions.

Subject to and limited by the foregoing objections, EEOC states that Mr. Pinckney was subjected to extreme bigotry and many racial slurs and epithets while working at Waste Pro, including the repeated and open use of the N-word in the

workplace.

January 8, 2024 Supplementary Response: As described in its objections,
EEOC believes this interrogatory seeks irrelevant information regarding comments
made by persons who are not connected to this lawsuit in any way.At the parties'
January 5, 2024 conferral, EEOC offered to further supplement its response to
include information Waste Pro sought, so long as Waste Pro amended the language
in its request to reflect its clarifications, and EEOC remains willing to do so.

EEOC further supplements its answer to this request to incorporate by
reference its response to Interrogatory No. 10. EEOC has not withheld any
information regarding the date and timing of events. EEOC reserves the right to
further supplement its response as it learns facts in discovery and acquires records
essential to refresh Mr. Pickney's recollection of the identities of persons and dates
of events.

**Interrogatory No. 5**: Identify the other aggrieved Black and/or Haitian-
American co-workers of Fednol Pierre or Deandra Pinckney who were present for
the derogatory racial comments or slurs as alleged in paragraph 18 of your
Complaint.

**Response:** EEOC objects to Interrogatory No. 5 because it is vague and
ambiguous in time and scope due to its reference to a single paragraph of the
Complaint. The phrase as "alleged in paragraph 18" suggests the request is strictly
limited to those facts believed to form the basis for that particular paragraph at the time

the allegation was made. To the extent the interrogatory is not limited in this way, it is overbroad and unduly burdensome, as it seeks an ongoing list of the identity of every person present for any responsive comment that parties subsequently learn about in depositions, witness interviews, and document discovery, particularly in light of the parties' equal "relative access to relevant information." *See* FRCP 26(b)(1).

Furthermore, EEOC objects to this interrogatory because it is overbroad and calls for speculation, it is impossible for EEOC to know or ascertain every person present for every racist utterance and slur. Moreover, the term "present" is objectionably vague and ambiguous because it is undefined and it is unclear whether "present" in this context refers to being present at the Waste Pro facility, present in the shop, within ear shot of every utterance, or if the term seeks the identity of participants in every conversation.

Additionally, EEOC objects to this request because it mischaracterizes the Complaint. Paragraph 18 does not allege discrete comments; rather, it states the "comments were ubiquitous" and occurred openly on an ongoing basis. *See Morgan*, 536 U.S. at 103 ("[h]ostile work environment claims are different in kind from discrete acts. Because their very nature involves repeated conduct . . . [it] cannot be said to occur on any particular day. It occurs over a series of days or perhaps years . . . in direct contrast to discrete acts . . . .").

Finally, EEOC objects to this request because it is premature. This interrogatory was served at the outset of discovery, before the parties exchanged

disclosures, document discovery and depositions. It is particularly inappropriate at this juncture because answering it first requires knowledge of every comment or utterance made about Mr. Pierre at Waste Pro, knowledge of which will undoubtedly be revealed in depositions of witnesses and Defendant.

Subject to and limited by the foregoing objections, EEOC has not yet identified additional class members aggrieved by the hostile work environment at Waste Pro's Jacksonville facility, but it will promptly update its disclosures and discovery responses if the identities of additional aggrieved persons are ascertained.

January 8, 2024 Supplementary Response: EEOC limited its response to this interrogatory based on its reasonable interpretation that Waste Pro sought to know the identity of other *aggrieved* persons, as the request says it is expressly says it is limited to "other aggrieved Black and/or Haitian- American co-workers."

**Interrogatory No. 6:**  Identify all employees who worked in the welding shop with Fednol Pierre while he was employed in the Jacksonville division.

**Response:** EEOC objects that this interrogatory it is vague and ambiguous because the term "welding shop" is undefined and subject to interpretation. However, EEOC reasonably interprets the request to seek the identity of the other welders who worked with Mr. Pierre at Waste Pro's Jacksonville location. *See* MDFL Civil Discovery Handbook § A.3 at 22.

Subject to and limited by the foregoing objections, EEOC states that Stacy Shuman and William Watts were the other two welders who worked in the welding

shop with Mr. Pierre. To the extent the request is broader and seeks the identity of non-welders with whom Mr. Pierre came into contact, EEOC states that he came in contact with many employees, including administrative staff, technicians, helpers, and drivers, who approached Mr. Pierre while he repaired their vehicles. Such information, including time cards and employee lists, was produced by Defendant during the investigation and is already within its Defendant's custody. *See* FRCP 26(b)(1) (noting scope of discovery is more narrow when parties have equal relative access to information).

**Interrogatory No. 7**:  For the picture that is included in paragraph 27 of the Complaint, identify (a) the person who took the picture, (b) the date and time the picture was taken, and (c) the names of all supervisors, managers or employees at Waste Pro who were shown the picture.

**Response:** EEOC objects to Interrogatory No. 7 because it is vague, ambiguous, unduly burdensome, not limited by time, and seeks to know the identity of every Waste Pro employee shown—*by anyone*—the picture featured in paragraph 27 of the Complaint. EEOC further objects to the request to the extent it seeks to know attorney client communications protected by the common interest doctrine. Finally, EEOC objects to the phrase "shown the picture" because it is vague, ambiguous, undefined in the request and subject to interpretation.

Subject to and limited by the foregoing objections, EEOC states Fednol Pierre took the picture on April 28, 2022 at 2:43 PM.

January 8, 2024 Supplementary Response: EEOC notes that this request seeks

information largely unavailable to EEOC.  For example, if Waste Pro witnesses, human resources personnel, or employees were "shown the picture" by another Waste Pro employee during the course of the EEOC investigation, EEOC has no way of knowing that information.

EEOC has provided all known responsive information it believes is relevant to this case and has not withheld relevant information on the basis of its objections. If Waste Pro wishes to clarify its request, correct its grammatical errors, or define objectionable terms, EEOC requests that Waste Pro modify the text of the request.

**Interrogatory No. 8**: For each circumstance of "ongoing harassment" that occurred toward Fednol Pierre after the "monkey incident" as alleged in paragraph 31 of the Complaint, state (a) the substance of harassment, (b) the date and approximate time of the harassment, (c) the identify of the person(s) who harassed Fednol Pierre, (d) all witnesses to each circumstance of harassment toward Fednol Pierre, and (e) the identity of all persons to whom Fednol Pierre complained about each circumstance of "ongoing harassment."

EEOC objects on the grounds this request is vague and ambiguous and mischaracterizes the allegation contained in paragraph 31, which refers to "ongoing harassment" Mr. Pierre endured over his employment in Jacksonville. The repeated racist diatribes endured by Mr. Pierre are not easily partitioned into discrete comments or individual slurs, nor does the law view them as such. In *National Rail Road Passenger Corporation v. Morgan*, the Supreme Court held that *"*[h]ostile work environment claims are different in kind from discrete acts. Because their very nature

18

involves repeated conduct . . . [it] cannot be said to occur on any particular day. It occurs over a series of days or perhaps years . . . in direct contrast to discrete acts . . . ." 536 U.S. 101, 103 (2002).  Neither Mr. Pierre's interview nor the Waste Pro employees' interviews by the EEOC, from which the allegation in paragraph 31 was derived, described the ongoing, frequent harassment Mr. Pierre endured in terms of individually divisible slurs/comments, and instead described a course of conduct involving slurs and comments occurring repeatedly, over the course of several months, from November 2021 through May 12, 2022.

Furthermore, EEOC objects as this is an unduly burdensome contention interrogatory, which is both premature at this stage, and better suited for a less burdensome discovery device such as a deposition. *Waters Edge Living, LLC v. RSUI Indem. Co.*, No. 06cv334-RH/WCS, 2008 WL 4539463, at *5 (N.D. Fla. Apr. 22, 2008) ("[w]here a party could use a different discovery tool to obtain the same information while imposing less of a burden, a court would be constrained to rule that a contention interrogatory need not be answered.") (internal quotations omitted); *In re Checking Acct. Overdraft Litig.*, No. 09-MD-02036-JLK, 2010 WL 5136043, at *3 (S.D. Fla. Dec. 16, 2010) ("Compelling parties to respond partially to such interrogatories early in the litigation when they will likely simply be asked to respond again, upon completion of document review or other phases of discovery, lacks finality and compounds the time, effort and cost of the litigation."). Moreover, Interrogatory No. 8 is overbroad because Mr. Pierre was the subject of numerous "circumstances" of harassment, and it would be impossible and impractical to recall

each instance.

EEOC also objects to Interrogatory No. 8 because it is vague and ambiguous in time and scope due to its reference to a single paragraph of the Complaint. The phrase "as alleged in paragraph 31 of the Complaint" suggests the request is strictly limited to those facts believed to form the basis for that particular paragraph of the Complaint at the time the allegation was made. Pursuant to MDFL Civil Discovery Handbook, the EEOC reasonably interprets the interrogatory to be limited as such. *See* § A.3 at 22. To the extent the interrogatory is not limited in this way, it is overbroad and unduly burdensome, as it seeks an ongoing list of every detail about every act of "ongoing harassment" the parties learn of in depositions, discovery, and witness interviews.

EEOC further objects because the terms in the request are undefined, vague and ambiguous in several respects. The term "each circumstance of ongoing harassment" is vague, ambiguous, subject to interpretation and is self-contradictory. The term "date and approximate time" is undefined and ambiguous in light of the definition of "date" provided in the definition section of the interrogatories, which seeks only the month and year. Likewise, the term "toward Mr. Pierre" is vague, ambiguous and undefined, because whether a racial slur used in the presence of someone is used towards them is subject to interpretation.

Subject to and limited by the foregoing objections, EEOC states that its allegation is that Respondent never took adequate remedial measures and failed to

investigate Mr. Pierre's complaints of ongoing harassment, such that the harassment is believed to have continued throughout his employment; therefore, EEOC refers Defendant to its response to Interrogatory Nos. 1 and 10, which outline circumstances of harassment at issue in this case.

Additionally, EEOC states that after the monkey incident, Mr. Watts made comments comparing Mr. Pierre to a monkey, and he and Mr. Shuman continued to treat Mr. Pierre in a hostile manner. Both men refused to communicate or work with him and locked up tools and equipment so as to prevent Mr. Pierre from using them. They continued to leave Mr. Pierre to do the least desirable, unsafe, and tedious work by himself, often requiring him to jeopardize his safety and stay late to complete the work.

In addition, after the monkey incident on April 28, 2022, Waste Pro, through Ms. Risner, Mr. Juniper and Mr. Williams, refused to investigate Mr. Pierre's additional complaints of discrimination and failed to take adequate remedial measures. Instead, Defendant humiliated Mr. Pierre by requiring him to attend an antidiscrimination training after outing him as the complainant to his co-workers, permitted Mr. Shuman and Mr. Watts to lock up tools so that Mr. Pierre could not access them, and declined to terminate Mr. Watts or Mr. Shuman, requiring Mr. Pierre to work the night shift or suffer additional harassment from Mr. Watts and Mr. Shuman.

January 8, 2024 Supplementary Response:  EEOC reiterates that information

sought in this request is duplicative of information sought in Request No. 10 and it incorporates by reference its response to that interrogatory as well as to Interrogatory No. 3 and 9.

Additionally, as described in its objections, EEOC narrowed its answer to this interrogatory based on its reasonable interpretation of the language of the request, but it otherwise fully responded to the interrogatory with all presently known facts. Additionally, at the parties' January 5, 2024 conferral, EEOC offered to further supplement its response to include any additional information Waste Pro sought, so long as Waste Pro amended the language in its request to identify the precise information sought. EEOC remains willing to further supplement its response to provide additional information, so long as the clarifications are reduced to writing.

**Interrogatory No. 9:** Specify every tool or piece of welding equipment that was locked up by William Watts or Stacy Shuman so that Fednol Pierre could not access it as alleged in paragraph 30 of your Complaint and for each occasion that a tool or piece of welding equipment was locked up, describe what was done by Fednol Pierre upon learning that each tool or piece of welding equipment was locked up by William Watts or Stacy Shuman.

**Response:** EEOC objects to this interrogatory because it is vague, ambiguous, unduly burdensome, and nonsensical. By asking EEOC to identify "each occasion that a tool or piece of welding equipment was locked up" the request asks EEOC to specify details for which it lacks first-hand knowledge. The request is also vague and ambiguous because it asks EEOC to describe "what was done" by Fednol Pierre

upon learning each piece of welding equipment was locked up and fails to define this term.

EEOC further objects to Interrogatory No. 9 because it is vague and ambiguous in time and scope due to its reference to a single paragraph of the Complaint. The phrase "as alleged in paragraph 30 of your Complaint" suggests the request is strictly limited to those facts believed to form the basis for that particular paragraph of the Complaint at the time the allegation was made. Pursuant to MDFL Civil Discovery Handbook, the EEOC reasonably interprets the interrogatory to be limited as such. *See* § A.3 at 22. To the extent the interrogatory is not limited in this way, it is overbroad and unduly burdensome, as it seeks an ongoing list of every instance when a tool was locked up by Mr. Shuman or Mr. Watts, which is information better suited for the parties to learn in the depositions of Mr. Shuman and Mr. Watts, discovery, and witness interviews. The disclosure of such information on an ongoing basis would be duplicative and violate the work product doctrine to the extent it would reveal the mental impressions and inferences of counsel.

Subject to and limited by the foregoing objections, EEOC answers that Mr. Shuman was permitted to construct a customized lock box, in which he would place numerous pieces of welding equipment and tools and to which he would not provide Mr. Pierre access, even after Mr. Pierre complained. Mr. Pierre believes the following items were locked in the box: tips for the torch, including wash tips and regular tips, O35 and 045 welding wire, welding nozzles, grinding wheels, strikers, and torches.

When Mr. Pierre learned the equipment necessary to do his work was unavailable, he attempted unsuccessfully to locate the item, make due without it, and he complained to Mr. Carter and Mr. Juniper when he became aware that necessary equipment had been locked in the box Mr. Shuman constructed.

**Interrogatory No. 10:**  For every manager or employee who you allege in your Complaint "subjected Black and Haitian-American employees in Jacksonville to hostile treatment, including racial slurs and derogatory comments, such as the N-word" as alleged in paragraph 36 of the Complaint, state (a) the identity of the manager or employee, (b) the person(s) who were subjected to the hostile treatment, (c) the date, time and location of the hostile treatment, (d) the nature of the hostile treatment, including the substance of every racial slur or derogatory comment, (e) all witnesses to the hostile treatment, and (f) the identify of any employee or manager who was told about the hostile treatment by the person who was the subject of it.

EEOC objects to Interrogatory No. 10 because it is an unduly burdensome contention interrogatory, which is both premature at this stage, and better suited for a less burdensome discovery device such as a deposition. *Waters Edge Living, LLC v. RSUI Indem. Co.*, No. 06cv334-RH/WCS, 2008 WL 4539463, at *5 (N.D. Fla. Apr. 22, 2008) ("[w]here a party could use a different discovery tool to obtain the same information while imposing less of a burden, a court would be constrained to rule that a contention interrogatory need not be answered.") (internal quotations omitted); *In re Checking Acct. Overdraft Litig.*, No. 09-MD-02036-JLK, 2010 WL

5136043, at *3 (S.D. Fla. Dec. 16, 2010) ("Compelling parties to respond partially to such interrogatories early in the litigation when they will likely simply be asked to respond again, upon completion of document review or other phases of discovery, lacks finality and compounds the time, effort and cost of the litigation."); *Bailey v. Equifax Credit Info. Servs., Inc.*, No. 1:14-CV-797-MHC-JCF, 2016 WL 11540575, at *2 (N.D. Ga. July 11, 2016) (holding a party "need not be required to identify, summarize and describe every single communication related in any manner . . . as doing so would be unduly burdensome.").

EEOC further objects to Interrogatory No. 10 because it is vague and ambiguous in time and scope due to its reference to a single paragraph of the Complaint. The phrases "you allege in your Complaint" and "as alleged in paragraph 36 of the Complaint" suggest the request is strictly limited to those facts believed to form the basis for that particular paragraph of the Complaint at the time the allegation was made. Pursuant to the MDFL Civil Discovery Handbook, the EEOC reasonably interprets the interrogatory to be limited as such. *See* § A.3 at 22. To the extent the interrogatory is not limited in this way, it is overbroad and unduly burdensome, as it seeks an ongoing list of every detail about every comment and every act of hostile treatment the parties learn of in depositions, discovery, and witness interviews.

Additionally, EEOC objects to subparts (d) and (e) of this request, which seek "(d) the nature of the hostile treatment, including the substance of every racial slur or derogatory comment," and "(e) all witnesses to the hostile treatment," because

they are overbroad and unduly burdensome. As outlined below, EEOC alleges numerous Waste Pro employees were subject to comments and hostile treatment over several years. Thus, reciting the circumstances of each instance of hostile treatment and listing every slur or comment would be impossible, impractical and require numerous interviews with witnesses that are outside the EEOC's control. *See Bray & Gillespie Mgmt., LLC v. Lexington Ins. Co.*, No. 6:07-CV-222-ORL19KRS, 2008 WL 5479701, at *4 (M.D. Fla. Nov. 25, 2008) ("Answering an inquiry to describe what certain identified witnesses may know about a subject calls for speculation or would require the unreasonably burdensome task of seeking those individuals out and inquiring as to their state of mind. What the witnesses identified may actually know can be determined by [Defendant] through other discovery processes as easily as [Plaintiff]."). EEOC also objects to the phrase "identify **[sic]** of any employee or manager" in subpart (f) because it is vague, ambiguous, overbroad and calls for speculation, as the subject entity is not specified, nearly anyone including counsel may be considered employees, and the request is not limited by time.

EEOC also objects to this request on the basis of the common interest privilege and work product doctrine to the extent the request seeks conversation between claimants and counsel and because the request seeks mental impressions and inferences deduced by counsel, such as which facts counsel speculates third-party witnesses will testify to at upcoming depositions. Finally, EEOC objects to this request to the extent answering it would reveal the possible existence of other charges of discrimination protected from disclosure by the confidentiality provisions

of Section 709 of Title VII.

Subject to and limited by the foregoing objections, EEOC answers that the allegations in Paragraph 26 of the Complaint are based on the EEOC's investigation, including interviews with employees at Waste Pro's Jacksonville facility, in which the following persons were identified as having contributed to the hostile treatment of Black and/or Haitian employees: William Watts, Stacy Shuman, Todd Juniper, Granville Carter, Tyler Carter, Tim Williams, Rita Risner, John Lovelady, Pete Ward, Tim (last name unknown), Nick (last name unknown); Terry (last name unknown), Andy (last name unknown), Clarence (last name unknown), and several unidentified employees.

The chart summarizes information learned by the EEOC through interviews during its administrative investigation. The information is summarized by person interviewed. It contains information reasonably accessible to EEOC at this time, but EEOC lacks first-hand knowledge of every hostile act or comment that took place. Such information is likely to come from Defendant and the identified witnesses themselves at depositions and from the investigative file, portions of which, including interview notes with the below persons, are produced in response to this interrogatory herewith. *See* EEOC Interrogatory Appendix 001-070.

| No. | Name and Contact Information | Response to subparts (a)-(f) |
|---|---|---|
| 1. | **Fednol Pierre**<br>**Welder** | As chronicled in the attached documents and witness interviews, Mr. Pierre was subjected to a hostile work environment at the Jacksonville facility from November, 2021 until May 12, 2022. *See* EEOC Interrogatory Appendix at 001-008, Johnson Interview; 009, Outten Interview; 53-63, Risner Interview; 068-070, EEOC Charge of Discrimination; 065-067, Inquiry Form.<br><br>The individual comments and hostile acts are too numerous and thus impractical to list; however, William Watts and Stacy Shuman used the N-word in the workplace and openly made other numerous comments about race and national origin in the workplace. They also treated Mr. Pierre with extreme disrespect and refused to communicate or work with him after learning of his complaints to management. Mr. Watts and Mr. Shuman locked up tools and equipment so as to prevent Mr. Pierre from using them, and left Mr. Pierre to do the least desirable, unsafe, and tedious work by himself, often requiring him to jeopardize his safety and stay late to complete the work.<br><br>Mr. Watts and Mr. Shuman placed a stuffed monkey in Mr. Pierre's work area in advance of an antidiscrimination training. Subsequently, Mr. Watts openly admitted to committing this act and made comments about Mr. Pierre's relation to monkeys.<br><br>Rita Risner, John Lovelady, Granville Carter and Todd Juniper failed to take adequate remedial measures after Mr. Pierre complained to them of discrimination, including failing to remove a stuffed monkey from his work area before, during or after a discrimination training, failing to adequately investigate his complaints, and failing to stop retaliatory acts by Mr. Watts and Mr. Shuman. Because Mr. Pierre left the facility due to the harassment and Defendant's failure to stop it, Waste Pro subsequently subjected Mr. Pierre to a work rule |

regarding employees walking off the job and placed a note in his file that he was not rehireable.

Walky Richmond, Deandra Pinckney, Jean Etienne, and Zachary Johnson witnessed the ongoing hostile treatment Mr. Pierre experienced at Waste Pro. In addition, others who happened to be present in the shop or lunch room may have seen the monkey and/or overheard the comments.

Mr. Pierre repeatedly reported the conduct to Rita Risner, John Lovelady, Granville Carter, Todd Juniper, and another unknown female Waste Pro manager.

January 8, 2024 Supplemental Response:

Mr. Pierre was able to recall several specific racial slurs and estimate the dates and who was nearby at the time they were made.

On or around November 2021, Mr. Watt's told Mr. Pierre that there was no need for him here, that he should go back to Haiti and called him a N*****. Around this time he also told him "you need to go back on the banana boat" These comments were made openly in the presence of his co-workers Walky Richmond, Stacy Shuman, and may have been overheard by others. *See* the interview notes in the Appendix to the interrogatories.

On or around December 2021 an argument took place between Mr. Shuman and Mr. Pierre in which Mr. Shuman called him a N*****. The incident was witnessed by Walky Richmond and may have been overheard by others.

During a meal period in the lunch area in January or February 2022, Mr. Watt's told Mr. Pierre that he should go back to Haiti where you are from and asked him if he likes to eat chicken all the time. The comment was witnessed by Zack Johnson.

In April 2022, after leaving a stuffed Monkey in his

|  |  | work area, Mr. Watts told Mr. Pierre that the monkey is his brother. The comment was made in the presence of Walky Richmond.<br><br>_EEOC has not withheld any information regarding the date and timing of events._ EEOC will supplement its Interrogatory Responses to the extent more information becomes available. |
|---|---|---|
| 2. | **Deandra Pinckney, Technician** | Mr. Pinckney was subjected to numerous discriminatory comments, including the N-word, by three different employees of the Jacksonville facility: Pete Ward, Clarence (last name unknown) and William Watts.<br><br>Black employees had to do more difficult work and white employees would frequently stand around while Mr. Pinckney worked from the ground under the vehicles.<br><br>Mr. Pinckney also witnessed the ongoing harassment experienced by Mr. Pierre and told the EEOC Stacy Shuman and William Watts would not permit Mr. Pierre to play Haitian music.<br><br>He stated that he believed management was aware the N-word was used in the workplace.<br><br>_January 28 2024 Supplemental Response:_<br><br>Mr. Watts also openly used the N-word in the workplace in the presence of Mr. Pickney, Jean Etienne, and Zack Johnson. Beginning on or around the time Mr. Pickney started in February 2021 and continuing during the time he worked with William Watts, Pete Ward and Clarence (last name unknown) they use the N-word openly in the workplace.<br><br>_EEOC has not withheld any information regarding the date and timing of events._ EEOC will supplement its Interrogatory Responses to the extent more |

| | | information becomes available. |
|---|---|---|
| 3. | **Brian Outten,** <br> **Former Maintenance Manager** | Mr. Outten told EEOC that Waste Pro management failed to remove the stuffed monkey from the facility even after Rita Risner, Tim Williams, and Todd Juniper were notified. <br><br> He stated that Mr. Watts admitted to placing the monkey in Mr. Pierre's work area. <br><br> He also stated Granville Carter, a supervisor, used racial slurs in the workplace, including regarding Mr. Pierre, and that he frequently told him not to use such language. He told the EEOC that he reported the issue to Regional Manager Todd Juniper, but that Mr. Juniper used similar language. |
| 4. | **Rita Risner** <br> **Regional Human Resources Director** | Rita Risner stated that she received complaints of race and national origin discrimination from Mr. Pierre and shared his complaints with other Waste Pro managers, including Todd Juniper. <br><br> Ms. Risner told the EEOC Ms. Risner allegedly interviewed only a small subset of possible witnesses to Mr. Pierre's complaint, did not remove the monkey from the work area before the discrimination training; did not discipline or terminate herself (or recommend discipline or termination) of Mr. Watts or Mr. Shuman. <br><br> She also stated William Watts told her he used the N-word in the workplace and made other racial comments and slurs. |
| 5. | **Zachary Johnson** <br> **Technician C** | Mr. Johnson told EEOC that Nick (last name unknown), Granville Carter, and Tyler Carter made jokes about Waste Pro employees' skin color and national origin. <br><br> He also stated Stacy Shuman and William Watts used racial slurs directed at Mr. Pierre every day or every other day at times. He stated that they called him a monkey and placed a stuffed monkey in his work area |

| | | and that Granville Carter and Tyler Carter witnessed the hostile treatment. |
|---|---|---|
| 6. | **Cierra Smith**<br>**Residential Driver** | Ms. Smith is a Black female. She stated that Waste Pro gave white employees the good trucks and Black employees were assigned to run-down trucks and that the trucks were not safe. She also stated that Black employees received worse equipment.<br><br>She told EEOC that Andy (last name unknown) had harassed her and asked her to take random drug tests, and terminated her when she finally refused.<br><br>She stated that she complained to Eric (last name unknown) about the bad trucks and routes. She stated that Jordan Stewart also witnessed the unfair treatment she described. |
| 7. | **Mellissa Pauley**<br>**Former Office Manager** | Ms. Pauley told EEOC that she believed Jacksonville Division Manager Tim Williams was racist and sexist.<br><br>She said Mr. Williams made overtly discriminatory comments at work towards Black people, women, and gay men, including George Searsy, a Black route supervisor, whom Williams treated differently because of his race, ridiculed for having "Billy Idol lips," and gave worse assignments. She stated she resigned from her position due to the discrimination.<br><br>She also stated Mr. Williams inquired about the race of a Black candidate for the dispatcher position she recommended for hire and harbored racial animus towards Black employees. |
| 8. | **Rhonda Petty**<br>**Residential Driver** | Ms. Petty told EEOC that she felt discriminated against because of her race (Black) and was sexually harassed by her supervisor Terry (last name unknown), whom she believed had a history of discriminatory conduct at Waste Pro.<br><br>She told EEOC that Black employees got worse assignments and equipment and white employees were |

| | | assigned to the best trucks. |
| | | She said she reported the discrimination to Larry Lemmon. |
| 9. | **Phyllis Johnson** **Residential Driver** | Ms. Johnson is a Black female. She stated she believed her supervisor Tim (last name unknown) treated her poorly on account of her race. She said she believed he did not give her assignments because of her race. |
| | | She also told EEOC that Tim made fun of the accent of a female co-worker who was from another country. |
| | | She said she complained to the HR manager named Tim, but he never returned her call, and she identified Rosaline (last name unknown) as a witness. |
| 10. | **Tatiyana Proctor** **Residential Driver** | Ms. Proctor, who is a Black female, told EEOC that Waste Pro treated Black employees differently. She stated that white employees were not disciplined for similar offenses and were treated more favorably. For example, her supervisor, Tim (last name unknown), gave preferential treatment to a white employee named Amy, who got a better truck and was exempted from testing. She stated Black employees would get the worse trucks, sometimes lacking air conditioning, and white employees would be given better trucks. |
| | | She identified Elijah Turner as a witness. |
| 11. | **Stacy Shuman** **Welder** | Mr. Shuman told the EEOC the stuffed monkey belonged to Mr. Watts and he saw it on the steel beam near Mr. Watts's tool box in the work area. |

EEOC reserves the right to supplement or amend these responses upon, among other things, discovery of additional facts and materials, and subject to other developments or proceedings in this action, including the joining of additional claimants.

**Interrogatory No. 11:** For each category of damages referenced in the Complaint, including without limitation regarding categories of damages referenced in Paragraph (c) of the Prayer for Relief, specify (1) the amount of damages, (2) the individual who suffered the damages, and (3) how the damages were calculated.

**Response:** EEOC objects to Interrogatory No. 11 as overbroad, unduly burdensome, and premature at this stage, because the request is likely to be the subject of expert discovery and is better suited for a less burdensome discovery device, such as a deposition. *See Petruzzella v. Allstate Ins. Co.*, No. 3:19-CV-1368-J-39JBT, 2020 WL 13369663, at *2 (M.D. Fla. Dec. 22, 2020) (rejecting early interrogatory for pain and suffering damage calculation and facts as overbroad and because it was information subject to expert discovery). This request is particularly inappropriate at this juncture because it was served in advance of the class identification deadline, at the outset of discovery, before the parties have exchanged disclosures, produced documents, and conducted depositions. *See* Fed. R. Civ. P. 33(a)(2) ("the court may order that the interrogatory need not be answered until designated discovery is complete."); *Waters Edge Living, LLC.*, No. 06cv334-RH/WCS, 2008 WL 4539463, at *5); *In re Checking Acct. Overdraft Litig.*, No. 09-MD-02036-JLK, 2010 WL 5136043, at *3 (S.D. Fla. Dec. 16, 2010) ("Compelling parties to respond partially to such interrogatories early in the litigation when they will likely simply be asked to respond again, upon completion of document review or other phases of discovery, lacks

finality and compounds the time, effort and cost of the litigation."). EEOC further objects to Interrogatory No. 11 because it is vague and ambiguous in time and scope due to its reference to a single paragraph of the Complaint. The phrase "referenced in your complaint" suggests the request is strictly limited to those facts pertaining to those paragraphs of the Complaint at the time the allegation was written. Pursuant to the MDFL Civil Discovery Handbook, the EEOC reasonably interprets the interrogatory to be limited as such. *See* § A.3 at 22. To the extent the interrogatory is not limited in this way, it is overbroad and unduly burdensome, as it seeks an ongoing list of every change in damage calculations pertaining to every claimant based on information the parties learn from experts, depositions, discovery, and witness interviews.

EEOC further objects to Interrogatory No. 11 because it is vague and ambiguous as to the phrase "including without limitation regarding categories of damages referenced in paragraph (c) of the Prayer for Relief." EEOC interprets this phrase to mean the total amount of damages of any variety due to all claimants.

Subject to and limited by the foregoing objections, EEOC answers that the Commission seeks compensatory up to $300,000 per person and punitive damages up to $300,000 per person in amounts to be determined at trial.

The EEOC seeks compensatory damages on behalf of Mr. Pierre, Mr. Pinckney, and the class of Waste Pro employees who were subjected to a hostile work environment because of their race, color, and/or national origin. These damages may include, but are not limited to, past and future pecuniary and non-pecuniary losses

resulting from Defendant's unlawful conduct, emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and other pain and suffering, in an amount to be determined at trial. However, EEOC is not seeking back pay on behalf on Mr. Pierre, Mr. Pinckney, nor the class. Punitive damages will also be sought, in an amount to be determined by the jury, in order to punish Defendant for acting with malice or reckless indifference to the federally protected rights of Mr. Pierre, Mr. Pinckney, and class members.

Notably, the computation of certain amounts of damages may also rely on expert witness testimony and is premature at this time. As such, the EEOC reserves the right to supplement, amend, revise, and correct computations of damages up until and during trial.

In addition, the EEOC seeks non-monetary equitable relief, including without limitation an order from the Court enjoining Defendant from engaging in future unlawful employment practices and requiring affirmative actions by Defendant, such as changes to Defendant's policies, procedures, practices, and personnel. The specific injunctive relief the EEOC seeks will depend upon information obtained during discovery.

January 8, 2024 Supplemental Response: At the parties' January 5, 2024 conferral, EEOC requested Waste Pro amend its interrogatory to more clearly identify the information sought by its request and define ambiguous and objectionable terms, but it refused to do so. Nevertheless, EEOC further clarifies it has identified two categories of damages applicable to Mr. Pickney and Mr. Pierre: EEOC computes

compensatory damages to be $300,000 each, based on each victim's emotional distress, mental anguish, emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and other pain and suffering. EEOC also computes punitive damages to be $300,000 each, which is a computation based upon Waste Pro's malice and reckless indifference to the federally protected rights of Mr. Pierre and Mr. Pinckney. EEOC does not allege either person suffered backpay or other pecuniary losses. EEOC has not yet identified additional class members, nor conducted fact-based discovery likely to bear on its calculations, and will update its response to this request, as required.

## **Verification**

I, Austin Case, duly swear, depose and say that I am a Trial Attorney of the U.S. Equal Employment Opportunity Commission ("EEOC"), that I reviewed the foregoing interrogatory responses, that while certain of the matters stated therein are not within my personal knowledge, the answers are true and correct based on information available to the United States Equal Employment Opportunity Commission.

January 8, 2024                                    Respectfully Submitted,


                                                   EQUAL EMPLOYMENT
                                                   OPPORUNTITY COMMISSION

                                                   KARLA GILBRIDE
                                                   General Counsel
                                                   U.S. EQUAL EMPLOYMENT
                                                   OPPORTUNITY COMMISSION
                                                   131 M Street, N.E.

Washington, DC 20507

ROBERT E. WEISBERG
Regional Attorney
Florida Bar No. 285676

KRISTEN M. FOSLID
Assistant Regional Attorney
Florida Bar No. 0688681

/s/ Austin N. Case
AUSTIN N. CASE
Trial Attorney
Connecticut Bar No. 439030
U.S. EQUAL EMPLOYMENT
OPPORTNITY COMMISSION
Miami District Office
Miami Tower
100 S.E. 2nd Street, Suite 1500
Miami, Florida 33131
Phone: 786-648-5846
austin.case@eeoc.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2024, the undersigned counsel provided a

copy of this document to counsel of record via electronic mail to:

Amy S. Shay
ashay@scsplaw.com

Matthew J. Pearce
mpearce@scsplaw.com

*/s/ Austin N. Case*
Austin Case

**WASTE PRO**
WITNESS INTERVIEW NOTES AND SCRIPT

☐        Contact Info Chart

| **Staff Conducting Interview:** | Michelle Linakis |
|---|---|
| **Witness Name** | Johnson, Zachary |
| **Telephone Number** | (904)720-3793 |
| **Date:** | 5/18/23 Linakis interviewed Johnson (904)720-3793 |
| **Time:** | 1:24 pm |
| **Summary:** | |
| **Call Back at Different Time:** | |

☒  **Didn't Answer Left Voice Message**
My name is Michelle Linakis and I am a paralegal with the U.S. Equal Employment Opportunity Commission. The EEOC is a federal agency that enforces federal laws prohibiting employment discrimination. I'm calling current and former Waste Pro employees who may have information that could be useful to an on-going investigation.

Please give me a call at (813)710-9368. I am available between the hours of 7 and 4:30pm, Monday through Friday [or by text message] at _____ [second time giving phone number].

Introduction:

Hi. My name is Michelle Linakis, I am a paralegal with the U.S. Equal Employment Opportunity Commission. We are a Federal Agency that enforces federal anti-discrimination laws in the workplace, including Title VII of the Civil Rights Act. At this time, we are investigating a claim of race and national origin discrimination at Waste Pro, where our records show you work[ed]. At this stage of our investigation,

we are trying to reach out to individuals, like you, who may have information that is useful in our investigation. Is it okay to ask you a few questions? Thank you!

### _Preliminary Questions_

- So we understand your job title is _**Technician C**_. I just want to confirm you are not currently employed as a supervisor or manager for Waste Pro?

☒ **Not a supervisor**     

- What are your dates of employment?

11/30/2020 to current

### _Background_

- What Waste Pro locations have you worked at?

Jacksonville

- Who is your supervisor?

Todd Juniper

- _* If no longer employed_ - why were you terminated?
    a. Did you think it was fair?  Or made sense?



    b. Were other employees terminated for the same reason?
        i. If so, who (_get all details known such timing of termination_)



- **\*[If in blue on Excel Sheet – rehired] – Were you rehired? If so, how did you come to get your job back. Did they tell you, whether you were rehireable?**

Left on my own because of the management.  The guy that took over supervision, just really picked on me.  I wasn't allowed to sit down on the job, he gave me a hard time.

- What race and national origin do you identify with?

> White.  National Origin is Cherokee.

### *Hostile Work Environment*

- While working at Waste pro, did you hear anyone anything about someone's race?
  - a. What was said?
  - b. By who?
  - c. When?
  - d. Frequency
  - e. Witnesses to this conduct? If so, who?
  - f. Have you heard any other similar comments in the workplace?

> I heard William "Billy" Watts (no longer working there) and Stacy Shuman make comments against Fed (LNU) (black).  Fed was an amazing welder, and Bill and Stacy would make comments directed at Fed and sometimes they would talk about him.  Like racial slurs, like how he's working.  They called him a monkey.  They put a monkey up on the computer where you login for him to see.  Sometimes they made comments every day, or every other day.  Probably the 2 witnesses that I know would be Tyler Carter and Buddy Carter (son and father).

- Did you see or did you hear about someone placing a stuffed gorilla in the shop in April of last year?

> See above

- Have you heard anyone use racial slurs, jokes or insults in the workplace?

> See above

- Have you heard anyone make political comments at work related to race?

> No.

### *National origin*

- Has anyone at Waste Pro ever made comments regarding people from a foreign country?
  - a. What was said?

**EEOC Interrogatory Appendix 003**

    b. By who?
    c. When?
    d. Frequency
    e. Witnesses to this conduct? If so, who?
    f. Have you heard any other similar comments in the workplace?

| |
|---|
| No. |

- While working at Waste pro, have you heard anyone say anything discriminatory about someone's national origin? (Who, Where, When, any Witnesses?)

| |
|---|
| No |

- Have you heard any managers or co-workers tell jokes about people from another country? (Who, Where, When, any Witnesses?)

| |
|---|
| Yes, after I got hired, Nick a supervisor, would make jokes toward me (because I'm darker skin). He called me a "peck stani" (like Pakistani) this was around December, 2022.  Tyler & Buddy heard this.  Nick also made comments to others but I don't remember what they were to who they were said to. |

- Have you heard anyone say anything negative about Haitian people or music? (Who, Where, When, any Witnesses?)

| |
|---|
| No |

- Did you hear or see anyone treated poorly or differently because of their race/national origin?
    a. What
    b. Who
    c. Where
    d. When
    e. Frequency
    f. Witnesses to this conduct? If so, who?

| |
|---|
| No |

- Do you know or work with William Watt's?

    a. Yes: ☒    No: ☐

**EEOC Interrogatory Appendix 004**

If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

> That's William "Billy" Watts.  Yes.  See above.  After the monkey incident we had an HR meeting, and then "Billy" was terminated.

- Do you know or work with Stacy Shuman?

    a.  Yes: ☒        No: ☐

    If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

    > Stacy's the welder that would make comments against Fed and put the monkey on the computer

- Did you know or work with Timothy Williams?

    a.  Yes: ☐        No: ☒

    If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

- Did you know or work with Carter Granville?

    a.  Yes: ☒        No: ☐

    If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

    > He's Tyler's dad Buddy

- Did you know or work with Todd Juniper?

    a.  Yes: ☒        No: ☐

    If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

    > That's my supervisor.  No, I never heard him say anything about someone's race or national origin.

- Did you know or work with Andy Toller?

    a.  Yes: ☒        No: ☐

**EEOC Interrogatory Appendix 005**

> If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

| |
|---|
| Yes.  He's a supervisor for driver.  No, I never heard him say anything about someone's race or national origin. |

### *Disparate Treatment*

- Did you see anyone getting worse equipment, assignments, routes because of their race or national origin, or gender?

| |
|---|
| No. |

- Did you hear anyone discuss not hiring more people of a particular race?
    i. If so, who? (*get additional details*)

| |
|---|
| No |

- Were you ever written up for performance or disciplined?
    a. What happened?
    b. Who wrote you up?
    c. Any one else get written up for the same thing? (*get details on names and their race*)
    d. When did this happen?

| |
|---|
| Yes.  Twice recently.  Caught on camera sitting down while on post and I wasn't that told I couldn't sit down on post until the Executive VP was going to come in.  Then the next day I was called in because they had me on camera sitting down and so I was written for that.  However, the video was from before the Executive VP's visit.  Then about 2 weeks ago, I was in the garage leaning up against the wall and smoking while on my break and the Executive VP was walking around.  I was called into my supervisor's office and he said that if I want to lean against the wall and smoke that I should go home and do that.  We were never told that we couldn't smoke or lean up against the wall.  I was written up. |

- Were employees treated differently based on race with respect to discipline?
    a. How?

    b. Examples of individuals treated differently for same infraction? (*identify
the individuals and get additional details on how they were treated differently
and when this occurred*)

> No

## <u>Retaliation</u>

- Did you ever complain to management, your supervisor or Human Resources about discrimination?

    **a. Yes: ☐**     **If so:**
        i. Who did you complain to in particular?
        ii. When?
        iii. How was it handled? (*investigation? Outcome? Did anybody reach out
to you to follow up?*)
        iv. did you receive any training or policies guiding you on how and
who to complain to?
            [If so, dates, length, topics]

>  

    **b. No: ☒**     **If not:**
        i. Did you know who you could complain to if needed?
        ii. How did you know that?
        iii. Did you receive any training or policies guiding you on how and
who to complain to? [If so, dates, length, topics)

> i.     Yes
> ii.    The handbook
> iii.   Don't remember

- Do you know any other employee who complained to management, HR, supervisor, about discrimination?
    a. If so, who? (*get all relevant details such as timing, who the complaint was
made to, outcomes, etc.*)

> No

### *Concluding Questions*

- Is there anything else that you think EEOC should know?

> No., not really.  Since the Executive VP is there, he's cleaning house, getting rid of people that he doesn't like.  They're mostly white people that he's getting rid of.

- Is there anybody you believe we should speak to that may have knowledge about discrimination?
  a.  If so, ask for names and contact information.
  b.  If a witness was previously identified, ask for their contact information.

> Probably Tyler and his dad.

- Verify current address on list and that the number called was the best number?
  a.  Yes: ☒      No: ☐

> Zachary Johnson, 1455 Oldenburg Dr, Jacksonville, FL 32218

  Other notes/comment summary:

>

| Created By | Posted On | Subject | Notes |
|---|---|---|---|
| 10250086 | General | 2023-07-26T09:16:39.320016 | Interview with witness Brian Otten on 5-10-23 Brian Outten- Interview 5/10/2023  hired on 4/2022 – terminated 9/2022<br>Supervisor- Fleet Manager in charge of the entire shop along with all the supervisors- to include Granville "buddy" Carter.<br>There has been time where they are in the office- Granville actually used racial slurs in workplace, Mr. Otten has frequently told Granville not use such language. Brain has reported this issues to Todd Juniper. However, Todd Juniper is a individual that is set in his own ways and has used the same type of language.<br><br>Fedonol was a welder under buddys supervisor, and Brain noticed it was a recipe for disaster. As Buddy has used offensive language against Fednol.<br> Mr. Brian did notice the stuff gorilla being placed on the work computer by William "Billy" Watts – he can confirm because he saw fednol upset as he approached him. Brian called a shop meeting with Tim Williams and Rita Risner next to Risner office. The meeting was called and conducted by Brian; he addressed the gorilla incident with no one confessed. He said that William Openly admitted to Brian to get a raise out of em. Brain states, William was terminate a week later based on time and attendance and not for the complaint made.<br>Mr. Outten had the authority to hire, fire and discipline employees<br><br>█████████████████████████<br>~~time or reported it.~~<br>He does not know about Mr. Watts behavior directly to a particular person- These are "good ol boys" they think that they can say anything, and nothing will happen to them. He thinks these are things that happened before. The only person he really put in place is against "Buddy"<br>Mr. Brian brought a lot of things to light employees' issues, maitance issues, parts issues- they wanted to force him to sweep things under the rug. He was participating in these actions- and was then retaliated against as he was given harsh deadlines, over worked, and fabricated a way so little to terminate Mr. Brian and accused him of false actions. He states this is a terrible company and treat employees as the bottom of the barrel. Mr. Brian was terminated by Todd juniper and Tim Williams.<br><br>█████████████████████ He only saw that gorilla that first time, because he cleaned the all the bays after he was hired. Lovejoy was the previous manager.<br><br>██████████████████████████. Brian, states Todd told him that fednol obtain representation, Fednol was not allowed to arrive to the company to get his tools unless he is escorted by a manager. However, Fednol arrived to get his gear as he was witness on camera footage. This footage was presented to Brian. Todd Juniper physically showed him the footage confirms the cameras work at the bay – they have motion cameras in the bay that work and store footage.<br>-If HR followed back up with him about Watts and Shuman later?- nothing no follow up<br>-get his current address.<br>Brian Outten<br>5153 Sardinero Trail |

**WASTE PRO**
WITNESS INTERVIEW NOTES AND SCRIPT

☐      Contact Info Chart

| Staff Conducting Interview: | Michelle Linakis |
|---|---|
| Witness Name | Pauley, Melissa |
| Telephone Number | (321)360-6153 |
| Date: | 5/24/23 |
| Time: | 9:51 am |
| Summary: | 5/24/23 Linakis interviewed Pauley (321)360-6153 |
| Call Back at Different Time: | |

☐  **Didn't Answer Left Voice Message**

My name is Michelle Linakis and I am a paralegal with the U.S. Equal Employment Opportunity Commission. The EEOC is a federal agency that enforces federal laws prohibiting employment discrimination. I'm calling current and former Waste Pro employees who may have information that could be useful to an on-going investigation.

Please give me a call at (813)710-9368. I am available between the hours of 7 and 4:30pm, Monday through Friday [or by text message] at _____ [second time giving phone number].

Introduction:

Hi. My name is Michelle Linakis, I am a paralegal with the U.S. Equal Employment Opportunity Commission. We are a Federal Agency that enforces federal anti-discrimination laws in the workplace, including Title VII of the Civil Rights Act. At this time, we are investigating a claim of race and national origin discrimination at Waste Pro, where our records show you work[ed]. At this stage of our investigation, we are trying to reach out to individuals, like you, who may have information that is useful in our investigation. Is it okay to ask you a few questions? Thank you!

## *Preliminary Questions*

- So we understand your job title is Office Manager. I just want to confirm you are not currently employed as a supervisor or manager for Waste Pro?

  ☒ **Not a supervisor**  ████████████████████
  ████████████████████████

- What are your dates of employment?

  | 3/16/22 to 5/30/22 |
  |---|

## *Background*

- What Waste Pro locations have you worked at?

  | Jacksonville |
  |---|

- Who is your supervisor?

  | Tim Williams |
  |---|

- *\* If no longer employed -* why were you terminated?
  - a. Did you think it was fair?  Or made sense?

  | No. I quit, because my boss Tim wasn't who I thought he was. He's racist and sexist.   Before I left, I wrote a letter to myself that I was thinking of sending, but never did. I didn't want to be involved in any drama.  That's too much for me.  I will email it to you.  I interviewed a girl (Black) for a Dispatcher position that I liked & Tim asked me if she was black or white.   There was another girl (Black) that I hired as a dispatcher, she lasted 3 days, she walked out and didn't let me know.  Tim told me I had to hire a man, but not a gay man, because women have too much drama.  That's when I decided that wasn't for me.  I've been in the HR business for 25 years. |
  |---|

  - b. Were other employees terminated for the same reason?
    - i. If so, who (*get all details known such timing of termination*)

  | |
  |---|

- **\*[If in blue on Excel Sheet – rehired] – Were you rehired? If so, how did you come to get your job back. Did they tell you, whether you were rehireable?**

  [                                                                    ]

- What race and national origin do you identify with?

  [ White                                                             ]

## *Hostile Work Environment*

- While working at Waste pro, did you hear anyone anything about someone's race?
  - a. What was said?
  - b. By who?
  - c. When?
  - d. Frequency
  - e. Witnesses to this conduct? If so, who?
  - f. Have you heard any other similar comments in the workplace?

  [ Only what was I said above                                        ]

- Did you see or did you hear about someone placing a stuffed gorilla in the shop in April of last year?

  [ No                                                                ]

- Have you heard anyone use racial slurs, jokes or insults in the workplace?

  [ See above                                                         ]

- Have you heard anyone make political comments at work related to race?

  [ No                                                                ]

## *National origin*

- Has anyone at Waste Pro ever made comments regarding people from a foreign country?
  - a. What was said?

**EEOC Interrogatory Appendix 012**

    b.  By who?
    c.  When?
    d.  Frequency
    e.  Witnesses to this conduct? If so, who?
    f.  Have you heard any other similar comments in the workplace?

> Not that I know of

- While working at Waste pro, have you heard anyone say anything discriminatory about someone's national origin? (Who, Where, When, any Witnesses?)

> No

- Have you heard any managers or co-workers tell jokes about people from another country? (Who, Where, When, any Witnesses?)

> No

- Have you heard anyone say anything negative about Haitian people or music? (Who, Where, When, any Witnesses?)

> No

- Did you hear or see anyone treated poorly or differently because of their race/national origin?
    a.  What
    b.  Who
    c.  Where
    d.  When
    e.  Frequency
    f.  Witnesses to this conduct? If so, who?

> Yes. What I said earlier. There was one other incident. George Searcy, a Black Supervisor, was already there when I started. Tim was new and was treating George differently. Other supervisors didn't have to go out on the truck every day, but George did. Tim gave George weird facial looks, like rolling of the eyes, "Billy Idol" lip, etc.

- Do you know or work with William Watt's?

    a.  Yes: ☐    No: ☒

**EEOC Interrogatory Appendix 013**

> If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

|  |
|---|

- Do you know or work with Stacy Shuman?

    a.  Yes: ☐        No: ☒

> If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

|  |
|---|

- Did you know or work with Timothy Williams?

    a.  Yes: ☒        No: ☐

> If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

| Tim was the Division Manager, over the entire Jacksonville Waste Pro.  Only what I said above. |
|---|

- Did you know or work with Carter Granville?

    a.  Yes: ☐        No: ☒

> If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

|  |
|---|

- Did you know or work with Todd Juniper?

    a.  Yes: ☒        No: ☐

> If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

| Todd Juniper, (White) manager, not sure what he did.  Never heard but I wouldn't put it past him.  Not someone I'd like to be around.  He's confident in his job security, and thinks he can get away with anything.  Very arrogant. |
|---|

- Did you know or work with Andy Toller?

    a.  Yes: ☒        No: ☐

**EEOC Interrogatory Appendix 014**

If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

> I have not heard him say anything about some's race or national origin.    Andy was the laziest person there and the other supervisor I mentioned above with George.

### *Disparate Treatment*

- Did you see anyone getting worse equipment, assignments, routes because of their race or national origin, or gender?

> Only George was always on a route and Andy was always sitting on his butt

- Did you hear anyone discuss not hiring more people of a particular race?
    i.  If so, who? (*get additional details*)

> No other than what I said earlier that was said directly to me.

- Were you ever written up for performance or disciplined?
    a.  What happened?
    b.  Who wrote you up?
    c.  Any one else get written up for the same thing? (*get details on names and their race*)
    d.  When did this happen?

> No.

- Were employees treated differently based on race with respect to discipline?
    a.  How?
    b.  Examples of individuals treated differently for same infraction? (*identify the individuals and get additional details on how they were treated differently and when this occurred*)

> No.  I don't think so.

## Retaliation

- Did you ever complain to management, your supervisor or Human Resources about discrimination?

    a.  **Yes:** ☐        **If so:**
        i.  Who did you complain to in particular?

     ii. When?

     iii. How was it handled? (*investigation? Outcome? Did anybody reach out to you to follow up?*)

     iv. did you receive any training or policies guiding you on how and who to complain to?

          [If so, dates, length, topics]

|  |
|--|
|  |

**b. No:** ☒     **If not:**

     i. Did you know who you could complain to if needed?

     ii. How did you know that?

     iii. Did you receive any training or policies guiding you on how and who to complain to? [If so, dates, length, topics)

| | |
|--|--|
| i. | Yes.  It would've been Rita, HR Generalist |
| ii. | Because I was the Office Manager and I had to know that |
| iii. | No.  There is a harassment video |

- Do you know any other employee who complained to management, HR, supervisor, about discrimination?

     a. If so, who? (*get all relevant details such as timing, who the complaint was made to, outcomes, etc.)*

| |
|--|
| No |

### *Concluding Questions*

- Is there anything else that you think EEOC should know?

| |
|--|
| I don't want to be in the drama.  She doesn't want to be involved in a trial. |

- Is there anybody you believe we should speak to that may have knowledge about discrimination?

     a. If so, ask for names and contact information.

     b. If a witness was previously identified, ask for their contact information.

| |
|--|
| No other than George (904)536-9817 |

- Verify current address on list and that the number called was the best number?

     a.  Yes: ☐        No: ☐

| Melissa Pauley 7644 Hambone Dr, Bryceville, FL 32009 (321)360-6153 |
|---|

Other notes/comment summary:

|  |
|---|

**WASTE PRO**
WITNESS INTERVIEW NOTES AND SCRIPT

☐　　　Contact Info Chart

| Staff Conducting Interview: | Michelle Linakis |
|---|---|
| Witness Name | Johnson, Phyllis L |
| Telephone Number | (904)660-8421 |
| Date: | 5/19/23 Linakis interviewed Phyllis Johnson |
| Time: | |
| Summary: | |
| Call Back at Different Time: | |

☐　**Didn't Answer Left Voice Message**

My name is Michelle Linakis and I am a paralegal with the U.S. Equal Employment Opportunity Commission. The EEOC is a federal agency that enforces federal laws prohibiting employment discrimination. I'm calling current and former Waste Pro employees who may have information that could be useful to an on-going investigation.

Please give me a call at (813)710-9368. I am available between the hours of 7 and 4:30pm, Monday through Friday [or by text message] at _____ [second time giving phone number].

Introduction:

Hi. My name is Michelle Linakis, I am a paralegal with the U.S. Equal Employment Opportunity Commission. We are a Federal Agency that enforces federal anti-discrimination laws in the workplace, including Title VII of the Civil Rights Act. At this time, we are investigating a claim of race and national origin discrimination at Waste Pro, where our records show you work[ed]. At this stage of our investigation, we are trying to reach out to individuals, like you, who may have information that is useful in our investigation. Is it okay to ask you a few questions? Thank you!

### *Preliminary Questions*

- So we understand your job title is ***Residential Driver ASL***. I just want to confirm you are not currently employed as a supervisor or manager for Waste Pro?

  ☒ **Not a supervisor** █████████████████████

  ████████████████ **r OK.)**

  - What are your dates of employment?

    | |
    |---|
    | 2/2022 to 5/19/22 |

### *Background*

- What Waste Pro locations have you worked at?

  | |
  |---|
  | Jacksonville on Strickland Rd |

- Who is your supervisor?

  | |
  |---|
  | Tim (LNU), & Terry Grady |

- *\* If no longer employed* - why were you terminated?
  a. Did you think it was fair?  Or made sense?

  | |
  |---|
  | Didn't have a truck for me to work/drive & they would send me home every day that the truck was not in working order and then they terminated me because they didn't have a truck for me to drive.  One day I got my period, and told them I have to go home, and they said don't you know when you expect your period.  They said that I had to take the truck to the dump first.  So I took the truck to the dump, and then I went home.  That was on a Friday.  Then on Monday I got written up because they said that when I took the truck to the dump it was not fully emptied.  One day I went home sick & called them & said I wasn't able to come in the next day because I wasn't feeling well and they told me over the phone that I was terminated.  I didn't think it was fair. |

  b. Were other employees terminated for the same reason?
     i. If so, who (*get all details known such timing of termination*)

  | |
  |---|
  | No. |

- **\*[If in blue on Excel Sheet – rehired] – Were you rehired? If so, how did you come to get your job back. Did they tell you, whether you were rehireable?**

|  |
|---|
|  |

- What race and national origin do you identify with?

| African American |
|---|

## *Hostile Work Environment*

- While working at Waste pro, did you hear anyone anything about someone's race?
  - a. What was said?
  - b. By who?
  - c. When?
  - d. Frequency
  - e. Witnesses to this conduct? If so, who?
  - f. Have you heard any other similar comments in the workplace?

| No |
|---|

- Did you see or did you hear about someone placing a stuffed gorilla in the shop in April of last year?

| No |
|---|

- Have you heard anyone use racial slurs, jokes or insults in the workplace?

| No |
|---|

- Have you heard anyone make political comments at work related to race?

| No |
|---|

### *National origin*

- Has anyone at Waste Pro ever made comments regarding people from a foreign country?
    - a. What was said?
    - b. By who?
    - c. When?
    - d. Frequency
    - e. Witnesses to this conduct? If so, who?
    - f. Have you heard any other similar comments in the workplace?

> Yes. A female from another county was made fun of her accent by Tim, a supervisor.

- While working at Waste pro, have you heard anyone say anything discriminatory about someone's national origin? (Who, Where, When, any Witnesses?)

> No

- Have you heard any managers or co-workers tell jokes about people from another country? (Who, Where, When, any Witnesses?)

> No

- Have you heard anyone say anything negative about Haitian people or music? (Who, Where, When, any Witnesses?)

> No

- Did you hear or see anyone treated poorly or differently because of their race/national origin?
    - a. What
    - b. Who
    - c. Where
    - d. When
    - e. Frequency

f.   Witnesses to this conduct? If so, who?

> The treated me different, nasty.  Every day I came in, I always had to ask if I could ride with them. Tim (LNU) & said that they didn't have a truck for me to ride in.  They hired a bunch of drivers and had no equipment.  A lot of people saw me waiting, but I don't know their names.

- Do you know or work with William Watt's?

   a.  Yes: ☒       No: ☐

      If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

   > No

- Do you know or work with Stacy Shuman?

   a.  Yes: ☐       No: ☒

      If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

   > 

- Did you know or work with Timothy Williams?

   a.  Yes: ☐       No: ☒

      If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

   > 

- Did you know or work with Carter Granville?

   a.  Yes: ☐       No: ☒

      If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

   > 

- Did you know or work with Todd Juniper?

   a.  Yes: ☐       No: ☒

**EEOC Interrogatory Appendix 022**

If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

- Did you know or work with Andy Toller?

  a. Yes: ☒    No: ☐

    If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

Andy Toller, a supervisor that made me feel like shit because I got my period. See above. Rosaline (LNU)(black) helped me with my route that day. She's one of the best drivers along with Robert Hutchinson (White).

### *Disparate Treatment*

- Did you see anyone getting worse equipment, assignments, routes because of their race or national origin, or gender?

Yes. One day Hutchinson's truck broke down and I went to pick him up and my truck broke down.

- Did you hear anyone discuss not hiring more people of a particular race?
    i. If so, who? (*get additional details*)

No

- Were you ever written up for performance or disciplined?
    a. What happened?
    b. Who wrote you up?
    c. Any one else get written up for the same thing? (*get details on names and their race*)
    d. When did this happen?

I was written up by Tim (LNU) when I didn't dump the truck properly.

- Were employees treated differently based on race with respect to discipline?
    a. How?

b. Examples of individuals treated differently for same infraction? (*identify the individuals and get additional details on how they were treated differently and when this occurred*)

> No.  I'd rather not say.

## Retaliation

- Did you ever complain to management, your supervisor or Human Resources about discrimination?

  **a. Yes: ☐       If so:**
  - i. Who did you complain to in particular?
  - ii. When?
  - iii. How was it handled? (*investigation? Outcome? Did anybody reach out to you to follow up?*)
  - iv. did you receive any training or policies guiding you on how and who to complain to?
       [If so, dates, length, topics]

  >

  **b. No: ☒       If not:**
  - i. Did you know who you could complain to if needed?
  - ii. How did you know that?
  - iii. Did you receive any training or policies guiding you on how and who to complain to? [If so, dates, length, topics]

  > I left a message to Tim, HR manager, to complain and he never returned my call.

- Do you know any other employee who complained to management, HR, supervisor, about discrimination?
  - a. If so, who? (*get all relevant details such as timing, who the complaint was made to, outcomes, etc.*)

  > No.  I think William Watts may have complained to HR.  I can't recall what happened to him.  He was a trainer and next thing you know he was terminated.  They told him that he had garbage in his recycle truck

### *Concluding Questions*

- Is there anything else that you think EEOC should know?

| |
|---|
| No, that's it. |

- Is there anybody you believe we should speak to that may have knowledge about discrimination?
    a. If so, ask for names and contact information.
    b. If a witness was previously identified, ask for their contact information.

| |
|---|
| William Watts, Roseline |

- Verify current address on list and that the number called was the best number?

    a.  Yes: ☒      No: ☐

| |
|---|
| Phyllis L Johnson, 7221 Ken Knight Dr. W, Jacksonville, FL 33209 |

Other notes/comment summary:

| |
|---|
| |

**WASTE PRO**
WITNESS INTERVIEW NOTES AND SCRIPT

☐       Contact Info Chart

| Staff Conducting Interview: | Michelle Linakis |
|---|---|
| Witness Name | Petty, Rhonda V. |
| Telephone Number | (904)304-2484 |
| Date: | 5/22/23 Linakis interviewed Petty (904)304-2484 |
| Time: | 11:55am |
| Summary: | Petty was sexually harassed by Terry (LNU). Didn't file a complaint; afraid of retaliation |
| Call Back at Different Time: | |

☐ **Didn't Answer Left Voice Message**

My name is Michelle Linakis and I am a paralegal with the U.S. Equal Employment Opportunity Commission. The EEOC is a federal agency that enforces federal laws prohibiting employment discrimination. I'm calling current and former Waste Pro employees who may have information that could be useful to an on-going investigation.

Please give me a call at (813)710-9368. I am available between the hours of 7 and 4:30pm, Monday through Friday [or by text message] at _____ [second time giving phone number].

Introduction:

Hi. My name is Michelle Linakis, I am a paralegal with the U.S. Equal Employment Opportunity Commission. We are a Federal Agency that enforces federal anti-discrimination laws in the workplace, including Title VII of the Civil Rights Act. At this time, we are investigating a claim of race and national origin discrimination at Waste Pro, where our records show you work[ed]. At this stage of our investigation,

we are trying to reach out to individuals, like you, who may have information that is useful in our investigation. Is it okay to ask you a few questions? Thank you!

### *Preliminary Questions*

- So we understand your job title is ***Residential Driver ASL***. I just want to confirm you are not currently employed as a supervisor or manager for Waste Pro?

  ☒ **Not a supervisor**



- What are your dates of employment?

| |
|---|
| 3/30/22 to 10/25/22 |

### *Background*

- What Waste Pro locations have you worked at?

| |
|---|
| Jacksonville |

- Who is your supervisor?

| |
|---|
| Andy (LNU) (White), then Eric (LNU) (Black) |

- \* *If no longer employed* - why were you terminated?
    a. Did you think it was fair?  Or made sense?

| |
|---|
| I left, was not terminated.  I left on the 24th because I didn't want to be sexually harassed by Terry (LNU) I didn't feel like I wanted to go through the process of filing a charge.  I got there early that morning and Terry said "I'll smack the shit out of me."  Because I didn't take on any of his advancements.  He was always hitting on me.  When he said that, that was the last straw.  I didn't go to HR, because I felt that HR already knew about Terry. Terry was Operational Supervisor at one time; he got in trouble with HR, and was moved to Orlando, then he came back he was the Operations Hiring Manager. Terry is white.  I was very excited working with Waste Pro.  I really liked working for Waste Pro. I called Larry lemon who trained me and told him why I left.  Lemon she he was sorry that I left and said that Terry should've known that was wrong because he was disciplined before for the same problem. |

    b. Were other employees terminated for the same reason?
        i. If so, who (*get all details known such timing of termination*)

| |
|---|
| |

- **\*[If in blue on Excel Sheet – rehired] – Were you rehired? If so, how did you come to get your job back. Did they tell you, whether you were rehireable?**

|  |
|--|

- What race and national origin do you identify with?

| African American |
|--|

### *Hostile Work Environment*

- While working at Waste pro, did you hear anyone anything about someone's race?
  a. What was said?
  b. By who?
  c. When?
  d. Frequency
  e. Witnesses to this conduct? If so, who?
  f. Have you heard any other similar comments in the workplace?

| No. |
|--|

- Did you see or did you hear about someone placing a stuffed gorilla in the shop in April of last year?

| I heard about, but I heard that the guy that was running the shop was fired.  I don't remember his name. |
|--|

- Have you heard anyone use racial slurs, jokes or insults in the workplace?

| No, but I felt like what I experienced could be considered a race discrimination. |
|--|

- Have you heard anyone make political comments at work related to race?

| No |
|--|

### *National origin*

- Has anyone at Waste Pro ever made comments regarding people from a foreign country?
  - a. What was said?
  - b. By who?
  - c. When?
  - d. Frequency
  - e. Witnesses to this conduct? If so, who?
  - f. Have you heard any other similar comments in the workplace?

| No |
|---|

- While working at Waste pro, have you heard anyone say anything discriminatory about someone's national origin? (Who, Where, When, any Witnesses?)

| No |
|---|

- Have you heard any managers or co-workers tell jokes about people from another country? (Who, Where, When, any Witnesses?)

| No |
|---|

- Have you heard anyone say anything negative about Haitian people or music? (Who, Where, When, any Witnesses?)

| No |
|---|

- Did you hear or see anyone treated poorly or differently because of their race/national origin?
  - a. What
  - b. Who
  - c. Where
  - d. When
  - e. Frequency
  - f. Witnesses to this conduct? If so, who?

| No |
|---|

- Do you know or work with William Watt's?

    a.  Yes: ☒        No: ☐

        If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

    > I'm not sure what his position was.  No  I never talked or was around him.

- Do you know or work with Stacy Shuman?

    a.  Yes: ☐        No: ☒

        If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

    >

- Did you know or work with Timothy Williams?

    a.  Yes: ☒        No: ☐

        If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

    > No

- Did you know or work with Carter Granville?

    a.  Yes: ☐        No: ☒

        If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

    >

- Did you know or work with Todd Juniper?

    a.  Yes: ☒        No: ☐

        If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

    > No

- Did you know or work with Andy Toller?

    a. Yes: ☒    No: ☐

        If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

| No. |
|-----|

### *Disparate Treatment*

- Did you see anyone getting worse equipment, assignments, routes because of their race or national origin, or gender?

| All the time.  Yes.  Blacks got worse assignments, equipment.  The other races got the best trucks. |
|---|

- Did you hear anyone discuss not hiring more people of a particular race?

| No. |
|-----|

    i. If so, who? (*get additional details*)

- Were you ever written up for performance or disciplined?
    a. What happened?
    b. Who wrote you up?
    c. Any one else get written up for the same thing? (*get details on names and their race*)
    d. When did this happen?

| Written up for hitting a mailbox by Andy.  The garbage truck's arm knocked over someone's mailbox and they tried to charge me for replace it.  This was around September 15, 2022.  Happened to Allen (black) and he also got written up for the same thing and they didn't ask him to pay for the brick mailbox he knocked over. |
|---|

- Were employees treated differently based on race with respect to discipline?
    a. How?
    b. Examples of individuals treated differently for same infraction? (*identify the individuals and get additional details on how they were treated differently and when this occurred*)

| I don't know. |
|---|

## Retaliation

- Did you ever complain to management, your supervisor or Human Resources about discrimination?

    **a. Yes: ☐      If so:**
    - i. Who did you complain to in particular?
    - ii. When?
    - iii. How was it handled? (*investigation? Outcome? Did anybody reach out to you to follow up?*)
    - iv. did you receive any training or policies guiding you on how and who to complain to?
        [If so, dates, length, topics]

    |  |
    |---|
    |  |

    **b. No: ☒      If not:**
    - i. Did you know who you could complain to if needed?
    - ii. How did you know that?
    - iii. Did you receive any training or policies guiding you on how and who to complain to? [If so, dates, length, topics)

    | i. | Yes, HR. |
    |---|---|
    | ii. | Our policy handbook. |
    | iii. | We received training on this |

- Do you know any other employee who complained to management, HR, supervisor, about discrimination?
    - a. If so, who? (*get all relevant details such as timing, who the complaint was made to, outcomes, etc.*)

    | No. |
    |---|

## *Concluding Questions*

- Is there anything else that you think EEOC should know?

    | No because I was afraid of retaliation during he process of filing a complaint. |
    |---|

- Is there anybody you believe we should speak to that may have knowledge about discrimination?
    - a. If so, ask for names and contact information.

b.  If a witness was previously identified, ask for their contact information.

| |
|---|
| No. |

- Verify current address on list and that the number called was the best number?

a.  Yes: ☒      No: ☐

| |
|---|
| Rhonda Petty, (904)304-2484.  PO Box 23144, Jacksonville, FL 32241. |

**WASTE PRO**
WITNESS INTERVIEW NOTES AND SCRIPT

☐        Contact Info Chart

| Staff Conducting Interview: | Michelle Linakis |
|---|---|
| Witness Name | Proctor, Tatiyana B. |
| Telephone Number | (904)909-0914 |
| Date: | 5/23/23 |
| Time: | 3:41 pm |
| Summary: | 5/23/23 Linakis interviewed Proctor |
| Call Back at Different Time: | |

⊠  **Didn't Answer Left Voice Message**

My name is Michelle Linakis and I am a paralegal with the U.S. Equal Employment Opportunity Commission. The EEOC is a federal agency that enforces federal laws prohibiting employment discrimination. I'm calling current and former Waste Pro employees who may have information that could be useful to an on-going investigation.

Please give me a call at (813)710-9368. I am available between the hours of 7 and 4:30pm, Monday through Friday [or by text message] at _____ [second time giving phone number].

Introduction:

Hi. My name is Michelle Linakis, I am a paralegal with the U.S. Equal Employment Opportunity Commission. We are a Federal Agency that enforces federal anti-discrimination laws in the workplace, including Title VII of the Civil Rights Act. At this time, we are investigating a claim of race and national origin discrimination at Waste Pro, where our records show you work[ed]. At this stage of our investigation, we are trying to reach out to individuals, like you, who may have information that is useful in our investigation. Is it okay to ask you a few questions? Thank you!

### _Preliminary Questions_

- So we understand your job title is **_Residential Driver ASL_**. I just want to confirm you are not currently employed as a supervisor or manager for Waste Pro?

  ☒ **Not a supervisor**   ███████████████

  ████████████████

- What are your dates of employment?

  | |
  |---|
  | 3/16/22 to 7/22/22 |

### _Background_

- What Waste Pro locations have you worked at?

  | |
  |---|
  | Jacksonville |

- Who is your supervisor?

  | |
  |---|
  | Eric, Andy and/or Tim |

- * _If no longer employed_ - why were you terminated?
  a. Did you think it was fair?  Or made sense?

  | |
  |---|
  | No reason was given for my termination.  I was sick, I called work to let them know that I was sick.  Management left messages on my phone, and when I called them I was told that I didn't have to come back to work.  I asked them why and wasn't given a reason. I didn't think it was fair. |

  b. Were other employees terminated for the same reason?
     i. If so, who (_get all details known such timing of termination_)

  | |
  |---|
  | No, but I have a friend that was terminated because of an accident.  His name is Elijah Turner. |

- **\*[If in blue on Excel Sheet – rehired] – Were you rehired? If so, how did you come to get your job back. Did they tell you, whether you were rehireable?**

  | |
  |---|
  | |

- What race and national origin do you identify with?

> Black, African American

### *Hostile Work Environment*

- While working at Waste pro, did you hear anyone anything about someone's race?
    a. What was said?
    b. By who?
    c. When?
    d. Frequency
    e. Witnesses to this conduct? If so, who?
    f. Have you heard any other similar comments in the workplace?

> A white employee got into an accident and was able to keep his job, but the black employee was not. I think this happened sometime in May or June of 2022.  This accident was mentioned in the news.  (Michelle looked it up, found several news articles, but it doesn't mention the driver or their race)

- Did you see or did you hear about someone placing a stuffed gorilla in the shop in April of last year?

> No

- Have you heard anyone use racial slurs, jokes or insults in the workplace?

> No

- Have you heard anyone make political comments at work related to race?

> They did that occasionally in the break room.  One incident a classmate (new employee) was getting preferential treatment from a supervisor.  The supervisor Tim white said that Amy didn't have to do any of the testing and she got a better truck.

### *National origin*

- Has anyone at Waste Pro ever made comments regarding people from a foreign country?
    a. What was said?
    b. By who?
    c. When?

    d.  Frequency
    e.  Witnesses to this conduct? If so, who?
    f.  Have you heard any other similar comments in the workplace?

| No |
|----|

- While working at Waste pro, have you heard anyone say anything discriminatory about someone's national origin? (Who, Where, When, any Witnesses?)

| No |
|----|

- Have you heard any managers or co-workers tell jokes about people from another country? (Who, Where, When, any Witnesses?)

| No |
|----|

- Have you heard anyone say anything negative about Haitian people or music? (Who, Where, When, any Witnesses?)

| No |
|----|

- Did you hear or see anyone treated poorly or differently because of their race/national origin?
    a.  What
    b.  Who
    c.  Where
    d.  When
    e.  Frequency
    f.  Witnesses to this conduct? If so, who?

| Yes.  Blacks would get the worse trucks, with no A/C and something was always wrong with them while the whites get the better trucks. |
|----|

- Do you know or work with William Watt's?

    a.  Yes: ☐    No: ☒

> If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

| |
|---|

- Do you know or work with Stacy Shuman?

   a. Yes: ☐    No: ☒

> If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

| |
|---|

- Did you know or work with Timothy Williams?

   a. Yes: ☒    No: ☐

> If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

| Not sure if this is the supervisor Tim I know.  Never heard him say anything about someone's race or national origin. |
|---|

- Did you know or work with Carter Granville?

   a. Yes: ☐    No: ☒

> If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

| |
|---|

- Did you know or work with Todd Juniper?

   a. Yes: ☐    No: ☒

> If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

| |
|---|

- Did you know or work with Andy Toller?

   a. Yes: ☒    No: ☐

**EEOC Interrogatory Appendix 038**

If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

| |
|---|
| Never heard him say anything about someone's race or national origin. |

### *Disparate Treatment*

- Did you see anyone getting worse equipment, assignments, routes because of their race or national origin, or gender?

| |
|---|
| Yes, like I mentioned above. |

- Did you hear anyone discuss not hiring more people of a particular race?
    i. If so, who? (*get additional details*)

| |
|---|
| No |

- Were you ever written up for performance or disciplined?
    a. What happened?
    b. Who wrote you up?
    c. Any one else get written up for the same thing? (*get details on names and their race*)
    d. When did this happen?

| |
|---|
| Just the termination.  Don't know who wrote me up, no reason given. 7/22/22. |

- Were employees treated differently based on race with respect to discipline?
    a. How?
    b. Examples of individuals treated differently for same infraction? (*Identify the individuals and get additional details on how they were treated differently and when this occurred*)

| |
|---|
| We got treated totally different.  An example is the accident I mentioned earlier. |

### Retaliation

- Did you ever complain to management, your supervisor or Human Resources about discrimination?

    a. **Yes: ☐        If so:**
        i. Who did you complain to in particular?
        ii. When?
        iii. How was it handled? (*investigation? Outcome? Did anybody reach out to you to follow up?*)

**EEOC Interrogatory Appendix 039**

iv.  did you receive any training or policies guiding you on how and who to complain to?
[If so, dates, length, topics]

| |
|---|
| |

**b. No: ☒**     **If not:**
  i.  Did you know who you could complain to if needed?
  ii.  How did you know that?
  iii.  Did you receive any training or policies guiding you on how and who to complain to? [If so, dates, length, topics)

| | |
|---|---|
| i. | No |
| ii. | X |
| iii. | Received some training but not on everything, like discrimination |

- Do you know any other employee who complained to management, HR, supervisor, about discrimination?
  a.  If so, who? (*get all relevant details such as timing, who the complaint was made to, outcomes, etc.*)

| |
|---|
| No |

### *Concluding Questions*

- Is there anything else that you think EEOC should know?

| |
|---|
| No |

- Is there anybody you believe we should speak to that may have knowledge about discrimination?
  a.  If so, ask for names and contact information.
  b.  If a witness was previously identified, ask for their contact information.

| |
|---|
| Elijah Turner |

- Verify current address on list and that the number called was the best number?

  a.  Yes: ☒     No: ☐

| |
|---|
| Tatiyana B. Proctor, 3684 August Crossing Ct, Jacksonville, FL 32210 (904)909-0914 |

Other notes/comment summary:

| |
|---|
| |

**EEOC Interrogatory Appendix 040**

**Stacy Shuman Interview**

1. How long have you worked at waste pro? April 19- present
2. -What is your title? Welder/ Mechanic
3. Who are your supervisors?  Todd Juniper
4. Were they also your supervisors throughout 2022 or did someone else supervise your work? He is the regional supervisor, yes.
   a. Is was a maintenance manager named Brian one of your supervisors? Yes
      i. What were his job duties? Not sure
      ii. What is his last name? Otten
      iii. Still talk to him, know what doing know? Not sure only called me on time after he left
         1. If yes, do you have contact info?
5. What are job duties? Repair work iron, mechanical duties on trucks.
6. Do you interact with welders as part of your job? Yes

7. In your time at Waste Pro, you worked with both Mr. Watt's, correct? Yes,
   a. Do you still talk to him, know what doing now? Yes, occasionally
      i. If yes, do you have contact info? He says no.
   b. Do you know why he left? He was terminated for missing work.

8. You attended a discrimination training on 4/28/22, correct?? Yes
   a. Who else attended? No, there was nobody there but him and Ms. Rinser
      Was it just your department? No he doesn't remember any meeting, he remembers going into ms. Risner and Mr. Juniper Present
   b. Which managers attended? They were not there.
   c. Have there been any other discrimination trainings since? No training have been given because that class training had nothing to do with what was going on.
   d. Who facilitated the training? No, not sure
   e. Did they say why the training was taking place? If you come across a racial issue and how to handle it
   f. Do you know why it was only your department and not the whole facility? They only picked a few of us.
   g. Who put on the training? Not sure
   h. Had you had other training in harassment and discrimination? No
   i. Do you remember how long the training took. [get estimate – longer than a half hour?]. Maybe 45 min
   j. What topics were discussed? Was it focused on race? Was national origin discrimination discussed? It touched on few areas

k.  Were there any tests; handouts videos, anything like that? No
    correspondence was given, I don't recall, I really don't remember. I think
    we watched a video
l.  Did Mr. Watts attend the training? He is not sure.
m.  Did Mr. Watts say anything to you about the training either before or
    after? No, I don't remember
n.  Had you attended any prior antidiscrimination trainings? No, I don't
    remember
o.  [what was involved in prior training, length materials, topics etc.)

**Interviews**

9.  Before the discrimination training had any of your supervisors or anyone from
    HR discussed race discrimination issues with you, that were alleged to have
    involved Mr. Watts? Yes, with Mr. Todd and Ms. Risner. Yes, they were both
    present
10. Which supervisors interviewed you about race discrimination allegations? Ms.
    Risner 20-30 min
11. Do you know what brought that on the discussion with _____? What did they tell
    the reason for the discussion was? Yes, I figured it out

**FOR Each interview:**

12. What did _____ ask you? Did I know about any racial slurs, or about the stuff
    animal. They asked my involvement.
13. anything else?
14. What did you tell them in response to their question about _, He said he was
    bully (Fednol) to Mr Watts and that he did witness.
15. So just they just asked you _____ and nothing else things? No
16. Did you give a written statement. Did they take notes? He might have, yes she
    took notes, Ms. Risner
17. Where did the interview occur? Her office Risner
18. Who else interviewed you when, when, Where? Anyone else?  Mr. Todd Juniper
    Present

19. Do you know if they interviewed anyone else?  No idea Who told you that?
20. Did you discuss your interview with Mr. Watts? No, I didn't talk to ho,
21. Did Ms. Risner or any supervisor, tell you the identity of the person made a
    complaint of race discrimination? I don't recall What did they tell you about the
    allegations? Other that it was racial slur and issues.

22. [So they told you Mr. Pierre made a complaint of race discrimination]
23. Did Ms. Risner tell you to keep your discussion confidential and not retaliate against Mr. Pierre? Yes, not talk about it with nobody
24. So ___, discussed race issues in your department with you. Anyone else? Mr. Shuman Now states he does not understand this.
    a. Did Ms. Risner, Granville Carter? Did Mr. Juniper ever discuss race discrimination issues with you or interview about allegations of race discrimination? -

## Watts and Pierre

25. Can you tell me a little bit about Mr. Watt's relationship with Mr. Pierre, did they get along? He thought they got along, they had to work together
    a. Did you see the interact with each other? Yes, we all work together
    b. Did they Bicker? No, not out of the ordinary  Say negative things? Not in front me
26. Our understanding, that there may have been some work inappropriate jokes, did you overhear anything? No, I have witnessed them no agree on certain things.
    a. Anybody make comments or jokes about Haiti? No, I don't think so
        i. Like what?
        ii. What would they bicker about?
        iii. Were there any arguments over Haitian music? Im not sure
        iv. Who else overheard them bickering? -
        v. Was management aware? -
        vi. Did Mr. Watts have conflicts with any other employee's at waste pro? Not to my knowledge
    b. Did you over hear anyone make comments or jokes about race? No
        i. Can you give an example?
        ii. Did Mr. Watt's or anyone else ever use the N word? Not that I recall
        iii. When was that how frequent?

## Security

1. Are there security cameras at the facility? Yes

2. Are there cameras at the entrances and exists, in your work area? Yes in all the areas. And I am pretty sure they are operational , yes they are in the work shop.

3. Have you ever seen security footage from the facility before? No

4. Do you know how long they retain it? Have you heard of them  tape in the past for any reason?

## Attendance

Can you tell me about the attendance policies in your department how does it work? Come to work on time, take your time and clock and clock and clock out at the end of the shift.

    a.  How do you clock in and out each day? With a badge, in the break room.

    b.  Who enforces it? I don't know

    c.  Have you ever been late for work? Yes

    d.  Have you ever had to  leave a shift early for personal reasons? Yes

    e.  Do you get an occurrence for that or who decides? Mr. Todd

    f.  Do you know if anyone else has ever been fired for attendance issue? Yes, but I don't remember the names.

    g.  Are you familiar with the handbook occurrence policy, is that strictly enforced in your department? There are rules- by the company book

## Gorilla Incident

27. Do you recall seeing a stuffed Gorilla holding an American flag at the facility? Larry John Subs Gorilla, yes.

28. When did you first see it?  Before the incident Where was it? It was on Steele beam where Mr. Watts Tool box was. Do you know who brought it to work? No Who put it there? I don't know.

29. Did you talk to any coworkers about it? NO What did they say?

30. Did Brian (maintenance manager) ask you about the Gorilla, what did you tell him? No- He might have but no conversation.

31. Did anyone else from management ask you if you knew where it came from? NO- not at all Who, when? Where? Anyone else?

32. Was that the only time they asked you about the stuffed gorilla? I guess, when someone complained

33.  Did you see anyone holding it? No

34. Did management address the stuffed Gorilla issue at a later meeting? Did they hold another training? No

35. Did management make any announcements regarding stuffed gorilla? No, I don't recall

36.  Or facility wide announcements regarding discrimination? I don't recall.

**WASTE PRO**
WITNESS INTERVIEW NOTES AND SCRIPT

☐        Contact Info Chart

| Staff Conducting Interview: | Michelle Linakis |
|---|---|
| Witness Name | Smith, Cierra |
| Telephone Number | (904)862-3235 |
| Date: | 5/22/23 Linakis interviewed Smith (904)862-3235 |
| Time: | 1:23pm |
| Summary: | Worked from 9/7/21 to 5/18/22. Terminated because she refused a random drug test. She felt that Andy, (Supervisor) was harassing her by asking her to take many random drug tests. The last one he asked her to take, she refused because he wasn't asking this of other employees. |
| Call Back at Different Time: | |

☐ **Didn't Answer Left Voice Message**

My name is Michelle Linakis and I am a paralegal with the U.S. Equal Employment Opportunity Commission. The EEOC is a federal agency that enforces federal laws prohibiting employment discrimination. I'm calling current and former Waste Pro employees who may have information that could be useful to an on-going investigation.

Please give me a call at (813)710-9368. I am available between the hours of 7 and 4:30pm, Monday through Friday [or by text message] at _____ [second time giving phone number].

Introduction:

Hi. My name is Michelle Linakis, I am a paralegal with the U.S. Equal Employment Opportunity Commission. We are a Federal Agency that enforces federal anti-discrimination laws in the workplace, including Title VII of the Civil Rights Act. At this time, we are investigating a claim of race and national origin discrimination at Waste Pro, where our records show you work[ed]. At this stage of our investigation, we are trying to reach out to individuals, like you, who may have information that is useful in our investigation. Is it okay to ask you a few questions? Thank you!

## *Preliminary Questions*

- So we understand your job title is ***Residential Driver ASL***. I just want to confirm you are not currently employed as a supervisor or manager for Waste Pro?

  

  ☒ **Not a supervisor**

- What are your dates of employment?

  > 9/7/21 to 5/18/22 Terminated.  Andy, Supervisor kept asking me to do random drug tests and the last one I refused because he wasn't asking this of other employees.

## *Background*

- What Waste Pro locations have you worked at?

  > Jacksonville on Strickland St.

- Who is your supervisor?

  > Eric was my supervisor and Andy was over Eric

- * *If no longer employed* - why were you terminated?
    a. Did you think it was fair?  Or made sense?

  > No.  I was really upset because since Waste Pro terminated me because of my refusal to take the drug test, the CDL had me go through a substance abuse program and now I have that on my permanent record.

      b.  Were other employees terminated for the same reason?

          i.  If so, who (*get all details known such timing of termination*)

| |
|---|
| No |

- **\*[If in blue on Excel Sheet – rehired] – Were you rehired? If so, how did you come to get your job back. Did they tell you, whether you were rehireable?**

| |
|---|
| |

- What race and national origin do you identify with?

| |
|---|
| Black, African American |

### *Hostile Work Environment*

- While working at Waste pro, did you hear anyone anything about someone's race?
  - a.  What was said?
  - b.  By who?
  - c.  When?
  - d.  Frequency
  - e.  Witnesses to this conduct? If so, who?
  - f.  Have you heard any other similar comments in the workplace?

| |
|---|
| No |

- Did you see or did you hear about someone placing a stuffed gorilla in the shop in April of last year?

| |
|---|
| No |

- Have you heard anyone use racial slurs, jokes or insults in the workplace?

| |
|---|
| No |

- Have you heard anyone make political comments at work related to race?

| |
|---|
| No |

### *National origin*

- Has anyone at Waste Pro ever made comments regarding people from a foreign country?
    - a. What was said?
    - b. By who?
    - c. When?
    - d. Frequency
    - e. Witnesses to this conduct? If so, who?
    - f. Have you heard any other similar comments in the workplace?

| No |
|---|

- While working at Waste pro, have you heard anyone say anything discriminatory about someone's national origin? (Who, Where, When, any Witnesses?)

| No |
|---|

- Have you heard any managers or co-workers tell jokes about people from another country? (Who, Where, When, any Witnesses?)

| No |
|---|

- Have you heard anyone say anything negative about Haitian people or music? (Who, Where, When, any Witnesses?)

| No |
|---|

- Did you hear or see anyone treated poorly or differently because of their race/national origin?
    - a. What
    - b. Who
    - c. Where
    - d. When
    - e. Frequency

f. Witnesses to this conduct? If so, who?

> Yes. When we come in in the morning, the whites get the good trucks and the black get the runned down trucks

- Do you know or work with William Watt's?

  a. Yes: ☐    No: ☒

  > If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

- Do you know or work with Stacy Shuman?

  a. Yes: ☐    No: ☒

  > If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

- Did you know or work with Timothy Williams?

  a. Yes: ☒    No: ☐

  > If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

  > No

- Did you know or work with Carter Granville?

  a. Yes: ☐    No: ☒

  > If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

- Did you know or work with Todd Juniper?

  a. Yes: ☐    No: ☒

> If yes: Have you heard him say anything about someone's race or national origin. (When, where, any witnesses?)

```


```

- Did you know or work with Andy Toller?

    a. Yes: ☒        No: ☐

        If yes: Have you heard him say anything about someone's race or national origin? (When, where, any witnesses?)

```
I think that's the supervisor.  Hear him say anything about race or national origin.  Just remarks like I can't stand that guy. I don't remember who he was talking about.
```

### *Disparate Treatment*

- Did you see anyone getting worse equipment, assignments, routes because of their race or national origin, or gender?

```
Blacks and females got worse equipment than the whites. I had trained Amy as a driver and after her training she got a better truck than me.  Amy and Andy, I believe were together, always flirting.
```

- Did you hear anyone discuss not hiring more people of a particular race?
    i. If so, who? (*get additional details*)

```
No
```

- Were you ever written up for performance or disciplined?
    a. What happened?
    b. Who wrote you up?
    c. Any one else get written up for the same thing? (*get details on names and their race*)
    d. When did this happen?

```
No
```

- Were employees treated differently based on race with respect to discipline?
    a. How?

    b. Examples of individuals treated differently for same infraction? (*identify the individuals and get additional details on how they were treated differently and when this occurred*)

> The got treated differently.  I think it was favoritism, I don't think it was race.

## Retaliation

- Did you ever complain to management, your supervisor or Human Resources about discrimination?

  **a. Yes: ☒      If so:**
      i. Who did you complain to in particular?
      ii. When?
      iii. How was it handled? (*investigation? Outcome? Did anybody reach out to you to follow up?*)
      iv. did you receive any training or policies guiding you on how and who to complain to?
          [If so, dates, length, topics]

> I complained to Eric about getting bad trucks, big routes.  Eric knew about it and told me to push trough and deal with it.  There was nothing he could do about it.  Andy was above Eric.  Yes.  We received training in our new hire handbook.

  **b. No: ☐      If not:**
      i. Did you know who you could complain to if needed?
      ii. How did you know that?
      iii. Did you receive any training or policies guiding you on how and who to complain to? [If so, dates, length, topics)

> 

- Do you know any other employee who complained to management, HR, supervisor, about discrimination?
      a. If so, who? (*get all relevant details such as timing, who the complaint was made to, outcomes, etc.*)

> No

## *Concluding Questions*

- Is there anything else that you think EEOC should know?

I don't feel like their trucks are safe. Their mechanics just rig the trucks. Also, if they're going to drug test people, then they should be testing the obviously drunk or drugged people. It's favoritism.

- Is there anybody you believe we should speak to that may have knowledge about discrimination?
    a. If so, ask for names and contact information.
    b. If a witness was previously identified, ask for their contact information.

Jordan (904)759-3412. We were close and we noticed the same things I discussed above.

- Verify current address on list and that the number called was the best number?

    a. Yes: ☒        No: ☐

Cierra Smith, 2285 Marsh Hawk Lane, Apt 16101, Fleming Island, FL 32003, (904)862-3235

Other notes/comment summary:

**Rita Risner**

**Regional Human Resources Manager Interview**

1. Name: Rita Risner
2. Title(s): Regional HR Manager
3. Dates of employment: 1/2/2022 – Current
4. Current job duties. Responsible for HR Operation Region- seven division Florida to Hilton Head, Recruiting , pay roll, net processing , department changes, disciplinary action.
5. Who is your direct supervisor, and their title? Brian Wintjen Regional VP- VP Shanon Early
6. Who do you supervise, and their titles? Amy Mathews HR generalist

**Investigation**
1. Did you supervise the investigation into Mr. Pierre's complaints of racial harassment? Yes
2. And based on the evidence obtained in the investigation, did you make a determination on those complaints? Yes (Did you determine his allegations were true?) No. **What was the determination exactly? – She could substanitat his complaint it was one word against another.**
3. [If she fights the question] Was it ultimately up to you to decide whether to write up, fire, conduct training, or take any other corrective actions based on the evidence obtained in the investigation of Mr. Pierre's complaints. Yes, discussed the findings with Mr. Juniper investigation entirely.
4. In making the determination what documents or evidence did you review? Spoke with Mr  Pierre william watts, stacy shuman, wallie richdmon possible of having knowledge of the complainst, reviewed notes with the,
   (a) Did you review notes from interviews? yes
   (b) Did you review any written statements? She said yes at first and then back tracked answer to no- that she did not receive any written statements.
   (c) Personally conduct interviews? Yes,  How many? 4
   (d) Did anyone else conduct interviews – No one else was invovlded.  how did they communicate the information they learned in the interview.
   (e) Did you instruct them to make a record of their interviews?
   (f) Did you interview any other employees? Why not? After speaking with CP- she asked if there was any witnesses, cp only indtified walkie Richmond.

5. How long did the investigation take? On or about end of march 2022, she informed CP on 4/28/2022 that she could not substantiate his complaints.
   i. Did the investigation ended on 4/28/22, YES- that is, when you made your determination and conducted the training? Training was conducted on the same day the investigation was completed.
   ii. Were there any subsequent complaints of discrimination since the training? Yes, after training Mr. Juniper reported that someone put the stuff gorilla in the maintenance shop- no witness was seen or that no information was left with the gorilla. Ms. Rita stated that there is no camera footage to the surveillance camera. She indicated there was no evidence to indicate with put that there.
   iii. Did you make any subsequent determinations or take any additional corrective actions? No corrective action was take just to monitor the situation. Mr. Pierre did not report the situation to HR.

6. How and when did you first learn about Mr. Pierre's allegations? Was that on 3/29/22? Yes, March 29, 2022
   i. Are there written notes regarding what Mr. Pierre told Mr. Carter? The only thing she was told if the CP can change his hours due to being tired of the racial comments. At firs the CP did not want to report the situation as he did not want be known as a narc- Mr. Juniper did report the complaint.
   Was he asked to write out a formal complaint at that time. Ms. Risner does not remember but she doesn't think there is one.
   ii. Before Mr. Pierre's complaint to Mr. Carter, had he ever made any other allegations of discrimination you are aware? Not that she is aware of.
   iii. Did Mr. Pierre make any other complaints of discrimination after he spoke to Mr. Carter?- He did not, not that she is aware of.
   iv. Did he make a complaint to Mr. Juniper? He did not, Mr. Juniper approached CP and asked him what was wrong. That's where he learned the CP complaints. That's where MR. Juniper reported the complaints to Mr. Risner.
   v. Did he Make a Complaint to a maintenance manager named Brian Otten? Not that she is aware of shes is not 100% sure
   vi. Did CP tell anyone other management officials about discrimination that you are aware of or just those four people: Granville, Juniper, Brian LNU, and you? Not that she is aware of, she only know of the 4 people.

7   In total, how many times did Mr Pierre notify management of the discriminatory conduct he was facing? 3 times that she is aware of.
    i.   [If she says she doesn't know, ask her if there is a document or record that would show it]. Just in her report she put together.

8.   Walk me through the steps of the investigation – upon learning of the allegations who did you talk to first.  When allegations came to her attention she spoke with CP- then during conversation she asked for witness to collab with his story to share info- he identified walkie richdmon, CP claims mr richdmon is being treated the same. She went to Mr. watts, spoke to him and spoke to shuman. She spoke to Richmond she stated he denied any racial slurs or issues. And that he has no problem with anyone and that everyone jokes around.
    i.   How long after your meeting with Mr. Pierre did you conduct the first interview? [get her to ballpark a number. Say something like, a few days, more than a week, less than two weeks?].a week after the compalaint was made.  First week of April 2022. She not always in that location she travels every day, as she services the region.
    ii.   And that interview was with Mr. Watts. She did interview Mr. Watts first one.
    iii.   Did you speak to him in person? Yes. What did he say? He said they always joke around, and they always use racial slurs and they do call each other cracker and nigger, she stated she put halt to that type of talk. Mr. watts says that he understood and that he would no longer do it, and that if there is another incident, they would be having a different conversation.
    iv.   What did you tell him this was about? Yes,
    v.   Did you have prewritten questions? No Take notes? Yes, Take witness statements? No Was anyone else present? No
    vi.   What did he say? Anything else?  NO
        1.   How frequently did he state racial jokes took place? He just said it was always
        2.   Did he give you any examples? Cracker, Nigger

        3.   Did he state that Stacy Shuman also made jokes and used the N word? He did not- he did not mention Mr. Shuman
        4.   Be he admitted to using the N word himself? Yes.
        5.   Did he implicate anyone else other than Himself and Mr. Pierre? No
    vii.   How long did that interview take? 30 Min, in Ms. Risner office

    viii   Did you draft any written summaries of the interview? No just typed notes. Tell anyone else about what Mr. Watts had said? Yes, Mr. Juniper Regional Maintained Manager. Region VP Brian provide overview of the findings

9. Who did you talk to second? yes   [Stacy Shuman]
    i. How long after your meeting with Mr. Watts did you conduct the second interview? The Same day Mr. Watts was interviewed First week of April 2022. Same location, same office.
    ii. And that interview was with Mr. Shuman
    iii. Did you have prewritten questions? No Take notes? Yes Witness statements? Was anyone else present? No
    iv. What did he say? Anything else?  Shuman said they always bickering and cussing at each other using racial comments, he states he doesn't use racial comments and that he stayed out of it.
    v. Did he dispute the information you had learned from Mr. Watts and Mr. Pierre regarding the use of the N word, racial jokes? Yes he did
    vi. Did you confront him with that information, did you tell him both Pierre and Watts had said they used the N word and told racial jokes. No she did not.
    vii. Did you or anyone else from waste pro talk to him again about Mr. Pierre's allegations of discrimination? Yes, she did. No one else
        1. Who when what was said? How did you learn about it? Documented?
        2. [or] so that is the only time he was interviewed regarding Mr. Pierre's allegations? Yes. He denied everything

10. Who did you talk to after Stacy Shuman? Mr. Richmond following week or after.
    i. How long after your meeting with Mr. Shuman did you conduct the third interview? {get her to estimate] the following week.
    ii. And that interview was with **Walky Richardoson?  Yes**
    iii. Same questions - did you have pre written questions no  or take notes yes ? Did you take a witness statement? Was anyone else present? No
    iv. What did you tell him the interview was about? Yes
    v. What did he say? Anything else?  How long was interview. He said they were just joke and denies any racial slurs or comments, he denies using any racial comments and doesn't have any issues with

anyone and that he did not go into details  And did not provide much information

    vi.  I understand he said there was some joking around, did you ask him for any examples of jokes? NO Did he mention any comments regarding Haiti or charging party's national origin? No

   vii.  Did he dispute the information you had learned from Mr. Watts and Mr. Pierre regarding the use of the N word, racial jokes? He did not provide any information.

  viii.  Did you or anyone else from waste pro talk to him again about Mr. Pierre's allegations of discrimination? Yes

        1.  Who when what was said? How did you learn about it? Documented?

        2.  So that is the only time he was interviewed regarding Mr. Pierre's allegations?

11. Other than these three interviews did you interview anyone else regarding Mr. Pierre's allegations? Yes

     i.  Did you interview any of the witnesses more than once? No

    ii.  Was anyone else interviewed regarding race discrimination at waste pro? When did those interviews take place? No

        1.  How did you learn of the content of those interviews, documented somewhere? Yes they are document in her notes.

   iii.  How long after

   iv.  Did anyone else interview the witnesses? No

12. Was Mr. Pierre's identity kept confidential throughout the investigation? No, she always informed them who the complaints come from. She addressed that the interviews is confidential and that corrective actions can be take if instructions were not followed.

     i.  Who did you notify Mr. Pierre had made a complaint? Yes she did

    ii.  Was Mr. Pierre told he could remain confidential? Were the witnesses you interviewed told they could remain confidential? No, she did say she would make thing confidential as best as she can, but she did have to disclose some information to better investigate the matter no speicifis were given

   iii.  During the month long investigation, did CP and Watt's and Shuman work at the same time? Yes, CP worked the night shift Did CPs shift overlap? yes they were initially

        1.  Was any effort made to separate them, beyond what CP did voluntarily? No, there is only one welding shop to work in.

2    Were any intermediate corrective actions taken before the
4/28/22 training? If so, what? No just the shift change

**Corrective Action**

a) I understand in response to his complaint the company held a training?
Harassment in general
b) How long was the training? 15 Min to 20 Min- What did it cover? Harassment,
Name calling, working together as team Who attended? Maintained team,
welders, and managers a hand book was provided with a harassment policy and
sign in sheet was givem.  Why not company wide? No, she does not know,
because there is an online training upon being hired.
c) Was any other corrective action taken?  No
   i)   [If yes –] Can you please describe why was that done. Is that documented?
d) Since that training have you had any additional complaints of racial
discrimination or harassment? No, only the gorilla inceident
   i)   If you had any other similar or additional discrimination trainings since?  No,
   but working on it.
   ii)  Has anyone ever been disciplined for misconduct related to alleged
   discrimination since the trainings? No

13. When was Mr. Pierre notified of your determination?
   i.   Was he told that Mr. Watt's had admitted to using the N word and
   making racial jokes?
   ii.  Was he told that Watt's received a verbal warning?
   iii. Did you notify anyone else of the determination? Watts? Shuman?

   iv.  Is it true that Mr. Shuman and Mr. Richmond said that they had
   not heard any racial comments or jokes of any kind?
      1.   Did you notify them Mr. Pierre and Mr. Watts say there was
      racial joking and banter? And ask them again if they are sure
      you didn't hear anything along those lines?
   v.   Was Mr. Pierre told that he had been accused of using
   inappropriate language himself? Warned or disciplined?

14. Does Waste Pro retain records of discrimination complaints over time, so
you could identify if this was the first, or say the 5th time someone had
been accused of discrimination? How are those records retained
electronically? Yes, as far as she knows its her first time. Yes they are
electronically in her region.

15. Had Mr. Pierre complain to any other Waste Pro Manager's regarding racial harassment? Did you speak to them about what was said? Brain yes, and Mr. Juniper

## Gorilla Incident

16. So I want to talk to you about an incident that took place on the day of the training. Apparently a stuffed gorilla waiving an American flag was placed at the employees clock in station on the day of the antidiscrimination training. Is that right? Did you actually see the gorilla? They have a shared computer on a podium tech and welders to use for the system to update their work. According to CP the gorilla was found at the station after the training.

**Share Screen show document –**

Do you recognize the document on screen, did you write it? OK, do you see the highlighted section just above your name where it says, **Read the whole highlighted section for her.**

"Later that day, after the meeting, Todd came to my office, [read entire portion]. At that point, I told todd there was really nothing we can do but continue to monitor that area and all of the employees."

**Do you see where it says that.**

17. Beyond monitoring, were any additional corrective actions taken? NO
    i. So nobody was disciplined? No
    ii. Another training didn't take place? No
    iii. You didn't re-interview any of the witnesses? Or Reopen the investigation? No

18. Do you know what footage, if any, Mr. Juniper reviewed? There was no footage, Are there any additional cameras? Yes, were the other cameras reviewed as well? She said no
    i. Did you ask him? Yes
    ii. Could the footage have showed someone walking around with a stuffed Gorilla in their hand.

19. Do you know who Mr. Juniper spoke to determine that nobody saw who put it there? Shes does not know, she assumes he spoke to tother welders

or techs Did he conduct any additional interviews? She believes he just asked. Shes does not know. Are there records of those interviews? No she does not know

20. Did you offer CP, any workplace accommodations, leave, separate him from Mr. Watt's and Shuman. Or was he expected to continue to work with them, even after the Gorilla incident? They did not offer additional accommodations, she just spoke to him two weeks after and CP stated no other issues were happening.

21. When did you learn Mr. Pierre had quit? May 13, 2022, he said he was done with this shit and left, management did try to approach him.

22. Did you interview or attempt speak to him to determine why he had quit? She tired calling one time but he didn't pick up

23. DO you know if it had anything to do with the investigation? Not that she is aware of, he didn't speak to anyone when he left.

24. Why wasn't Mr. Pierre's complaint confidently? Doesn't the handbook provide: the complaint was condifidentail, she says something was to be disclosed in order to do a proper investigation.

> "Complaints will be handled confidentially to the extent possible and consistent with the need to conduct a thorough investigation and implement appropriate remedial measures" ==yes she is aware==

25. Was Mr. Pierre notified that Mr. Watt's admitted to the allegations and that you had verbally warned him? No did she not

## Defenses and other topics if there is time:

1) Antidiscrimination policy and training for all employees? National training is provide for all employees. Electronic it's a video,
2) Who has authority to hire and fire? Managers and operation managers have the authority with HR approval.
   a) Do they receive any discrimination training?- Yes, they do. Online training for training.
3) What is company's affirmative action policy, what role does it play in hiring and also firing. Page 9 on company handbook

4) Work performance of Fednol Pierre? She is not aware no disciplinary actions  They do not have records of performance reviews.
5) Attendance issues? Excused absences? Rehireable? He is rehireable, but corporate makes that approval.
6) Prior complaints of discrimination in Jacksonville or against managers at that facility?  Not aware of previous complaints.
7) William Watts contact info? Terminated due attendance issue May 4, 2022, CLWATTS1011@gmail.com
   904-862-5553

8) Granville Carter Specific – CP asked for schedule change because of racial harassment- according to Mr. Carter, yest.
9) Stacy Shuman Specific
   a) witnessed William Watts, an ADO and CP "always bickering".  No

   How many people are in the shop- 3 bays 2 on day shift- 1 at night.

Fednol Pierre

On 3/29/22, Todd Juniper (Region Maintenance Manager) came to my office and said that Fednol Pierre asked his supervisor, Granville Carter (Maintenance Supervisor) if he could switch his hours and instead of coming in at 1:30 pm, he would like to come in at 3:30 pm.  His supervisor asked him why and he stated he was tired of the racial comments that his coworkers are making.  Granville reported this to Todd Juniper.  Granville also reported that he has not witnessed the behavior nor has Fednol reported it prior to this day.

Todd reported this to me on 3/30/22 and I asked Todd to speak with Fednol about it when he came in to work.  Todd stated that Fednol said that his co-workers, William Watts and Stacy Shuman, make racial comments to him like:  you should go back to Haiti where you are from and asked him if he likes to eat chicken all the time.  Todd explained to him that he will have to talk to HR and HR will conduct an investigation and Fednol didn't want it to go any further because he doesn't want to be known as a nark.  Once Todd brought this to HR, I informed Todd that I do have to speak with Fednol now that this has been reported.

I spoke with Fednol the following week and explained that I still had to go forward with the investigation, even though he did not wish to pursue it.   Fednol seemed to understand that and was cooperative.  He said that he was told that William was making comments about him like: "why are they bringing this guy over, we don't need any additional help here, we don't even know him" before he even transferred.  Fednol said that Willam and Stacy always made racial comments and William often referred to himself as a "cracker".  He said that William told him to go back to where he came from.  I asked Fednol if anyone witnessed these comments and he said Walky Richmond.  I informed him that I will need to speak with all three employees and any other witnesses that may come up and I would let him know when I have completed the investigation.

I spoke to William Watts first and he did say that they always joked around and often threw out racial slurs but Fednol did as well.  He denied telling  Fednol to go back where he came from.  He admitted to calling himself a "cracker" and Fednol would refer to himself as "nigger" and then vice versa.  I informed Williams that it is not okay to do that at work and it must stop immediately.  William said he understood and would not do it anymore.  I also informed William that he cannot say anything to Fednol that appears to be retaliation for reporting and if he did, we would be having a different conversation.  Lastly, I told William not to discuss this situation with anyone else.

I then spoke with Stacy Shuman and he said that "they" (William and Fednol) are always bickering at each other and cussing and throwing out racial comments.   I asked Stacy if he called him any names or made any racial slurs toward him and he said "no".  Stacy said he tried to stay out of it and just wanted to come to work and do his job and go home.  I informed Stacy that he cannot say anything to Fednol that appears to be retaliation for reporting and if he did, we would be having a different conversation.  I also told Stacy not to discuss this situation with anyone else.

Lastly, I spoke with Walky Richmond and he just said they "joke around".  He denied ever hearing any racial slurs or comments and also denied witnessing issues between Fednol, William and Stacy.  I informed Walky that he cannot say anything to Fednol that appears to be retaliation for reporting and if

he did, we would be having a different conversation.  I also told Walky not to discuss this situation with anyone else.


I concluded my investigation and determined that it was Fednol's word against William's and Stacy's and since I could not prove anything, we really couldn't do anything at that point other than have a meeting with all maintenance employees on harassment.

On 4/28/22, I informed Fednol that I concluded my investigation and could not substantiate his claim, however we do take this very seriously and I was going to hold a meeting with all of the maintenance employees.  I also told Fednol to report if anything is said to him in retaliation.  Later that day, after the meeting, Todd came to my office and reported that someone put a stuffed gorilla on top of the computer that everyone used.  I asked him if there was any note or anything identifying that this was for Fednol and he said "no".  I then asked Todd if anyone saw who put it there and he said "no".  Finally, I asked Todd if he could pull the camera footage so we can see who put it there and he said "unfortunately, we don't have cameras in that area"  At that point, I told Todd there was really nothing we can do but continue to monitor that area and all of the employees.


Rita Risner

Regional HR Manager

5/2/22

EEOC (Inquiry) Number: **510-2022-04567**

## Inquiry Information

### INQUIRY OFFICE

**Receiving:** Miami District Office

**Accountable:** Miami District Office

### POTENTIAL CHARGING PARTY

**Name:** Mr. Fednol Pierre

**Address:** 13069 Notre Dame Lane N
JACKSONVILLE, FL 32218

**Year of Birth:**

**Email Address:** fednolpierre@hotmail.com

**Phone Number:** (786) 816-8456

### POTENTIAL CHARGING PARTY'S DEMOGRAPHICS

**Gender:** M

**Disabled?** I do not have a disability

**Are you Hispanic or Latino?** not hispanic or latino

**Ethnicity:** Black or African American,

**National Origin:** Haitian

### RESPONDENT/Employer

**Organization Name:** Waste Pro USA

**Type of Employer:** Business or non-profit organization that I applied to, work for, or worked for

**Number of Employees:** 20 or more employees

**Address:** 2940 STRICKLAND ST
JACKSONVILLE, FL 32254

**County:**

**Phone Number:**

### LOCATION OF POTENTIAL CHARGING PARTY'S EMPLOYMENT

**Address:**

**EEOC Interrogatory Appendix 064**

**County:**

## RESPONDENT CONTACT

**Name:** Matthew  Pearce

**Email Address:** mpearce@sctlaw.com

**Phone Number:** (407) 316-0393

**Title:** Shareholder

## REASON(S) FOR CLAIM

**Date of Incident (Approximate):** 04/28/2022

**Reason for Complaint:** Race, National origin and/or ethnicity, Color

**Pay Disparity:**

**Location of Incident:** Florida

**Submission (initial inquiry) Date**  05/03/2022

**Claim previously filed as charge with EEOC?** No

**Approximate Date of Filing:**

**Charge Number:**  510-2022-04567

**Claim previously filed as complaint with another Agency?** No

**Agency Name:**

**Approximate Date of Filing:**

**Nature of Complaint:**

## Adverse Action(s)

After informing the Management at Waste Pro, USA of racial acts performed towards me it took months to be addressed and there still has not been any repercussions of the racist remarks and actions. It was investigated almost 5 months after I informed them and concluded as " He Say She Say" and the environment has become too intense to stay and work.

## APPOINTMENT

**Appointment Date and time:** 08/29/2022 08:30:00 EST

**Interview Type:** Phone

## APPROXIMATE DEADLINE FOR FILING A CHARGE: 02/22/2023

## Supplemental Information

### What Reason(s) were you given for the action taken against you?

I was not given any reason and it was unwarranted by all parties involved.

### Was anyone in a similar situation treated the same, better, or worse than you?

The statements and actions that were made towards me were also made towards Walkie Richemond and Jean.

### Please provide name(s) and email and/or phone number of anyone who will support your claim, and briefly describe the information this person will provide.

Walkie Richemond 646.276.5931
Dre Pinckney 904.908.7357
Jean 904.901.1657
Granvil Carter 540.290.6573

### Please tell us any other information about your experience?

I was hired through transfer by the company Waste Pro, USA in October 2021 and upon my arrival staff William Watts stated that there wasn't a need for me and I needed to return to my country and called me a Nigger. On another occasion William Watts found a monkey in the trash he placed it on the storage unit that another worker whom is of Haitian decent and I share and stated that it was our brother. After this I informed my direct supervisor John Lovelady of what occurred and he stated that he was going to speak with him.  In December 2021 another employee named Stacy Shuman called me a Nigger during a dispute regarding my work. I immediately reported in to my supervisor and again he stated that he will talk to him about it.  I was never spoken to about the incidents that had occurred until another supervisor brought it to the light that racial conversations were being held among these two employees and then he informed the Regional Maintenance Manger of the ongoing issue. Todd Jupiter the Regional Manager informed HR and a investigation was started. I did ask Todd why now when I reported months ago and nothing happened. There has been several instances were I have had to walk away to deescalate the tension due to the racist comments. In March 2022, HR called me in and interviewed myself and the other employees involved And on April 28th the results of the investigation was that it was stated as He say She say. I was told that the investigation was going to be closed. HR and the Regional Manager had a meeting with the entire staff and they went over workplace rules and regulations regarding racism and discrimination. As the meeting ended and before I can get to my work station the Monkey was placed on the computer that I use to log into work. I immediately went to Todd and informed him of what I found. He proceeded to HR and informed them. I then had to inform the new local maintenance manager of what I found and he took it upon himself to remove the monkey. I informed him that I could not stay the day as I was very upset that things were overlooked for so long Months and its blatant that there were no repercussions for this. I was asked to stay and work through it and I declined and left without pay.

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC FEPA | **510-2022-04567** |

| | Florida Commission On Human Relations | and EEOC |
|---|---|---|
| | *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| Mr. Fednol Pierre | 786-816-8456 | |

Street Address

6619 Azalea Park Road

JAX, FL 32258

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| Waste Pro USA | 101 - 200 Employees | |

Street Address

2940 STRICKLAND ST

JACKSONVILLE, FL 32254

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| Color, National Origin, Race, Retaliation | 10/01/2021 | 05/28/2022 |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am Haitian American. I was hired by the above above-named respondent on July 11, 2019, as a Welder. In October 2021, I requested a transfer to the Jacksonville, FL Office due to me relocating to the area. Upon my arrival to the office Mr. William Watts stated, There is no need for you here and that I needed to return to my country and called me a Nigger I reported this incident to Mr. John Lovelady. Moreover, In December 2021, another incident took place with another employee Mr. Stacy Shuman calling me a Nigger during a dispute, I again, reported this incident to my supervisor and again he said he will just talk to him. No reports or actions were taken by management on my complaints until Night Shift Supervisor Mr. Granvil Carter came across Mr. Shuman and Mr. Watts racial conversation and reported the incident to Regional Manager Todd Jupiter. Human Resources was notified by Mr. Jupiter of the ongoing racist antics Mr. Watts and Mr. Shuman were conducting. Human Resources launched an internal investigation. On April 28, 2022, Human Resources held an office meeting with all the employees to discuss racial discrimination in the workplace. At 2pm on the same day Human Resources concluded their investigation and informed me my complaints were based on he said, she said and closed the case. However, in the same day after the meeting concluded Mr. Watts found a stuffed gorilla inside a garbage truck and placed it on my log in computer. Another Haitian American co-worker and I found the monkey on the computer and Mr. Watts stated that the gorilla is our

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally Signed By: Mr. Fednol Pierre** **08/31/2022** *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 510-2022-04567 |

| Florida Commission On Human Relations | and EEOC |
|---|---|
| *State or local Agency, if any* | |

brother.  I immediately reported this incident to Regional Maintenance Manger Todd Jupiter he only stated that he will talk to Mr. Watts and to go to Human Resources, but no one was available as they left for the day. I felt so hurt and shocked that I couldnt continue to work that day due to my employer not acting to these discriminatory acts. On May 4, 2022, I learned through co-workers Mr. Watts was terminated but not confirmed to my knowledge. However, Mr. Shuman was still employed. Ultimately, On or about May 2022, I resigned my position to due being subjected to harsh discriminatory acts by my employer with no actions taken to correct my complaints. I believe that I have been discriminated and retaliated against because of my National Origin Hattian, Race Black and Color Black in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally Signed By: Mr. Fednol Pierre**<br><br>**08/31/2022** | SUBSCRIBED   AND   SWORN   TO   BEFORE   ME   THIS   DATE<br>*(month, day, year)* |
| *Charging Party Signature* | |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:**  Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.  **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2.  **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.  **PRINCIPAL PURPOSES.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.  **ROUTINE USES.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.  **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

**NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW**

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

**NOTICE OF NON-RETALIATION REQUIREMENTS**

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.